CLAFLIN *et al.* v. BENNETT *et al.*, (McCOY *et al.*, Interveners.)

(*Circuit Court, N. D. Illinois.* June 18, 1892.)

**1. ATTORNEY AND CLIENT—FEES—LIEN ON JUDGMENT.**
Where the amount due on a judgment recovered for the purchase price of property sold by plaintiff to defendant is paid into a court of equity for distribution, plaintiff's attorneys are entitled to receive therefrom the money due them from plaintiff for meritorious services rendered by them to him in other suits growing out of said purchase, where such services were rendered, with the expectation that they would be paid for out of the proceeds of such judgment.

**2. PARTNERSHIP—WHAT CONSTITUTES—EVIDENCE.**
Proof that two men owned a ranch and herd of cattle jointly, that they managed the ranch together, rendered accounts in their joint names, and referred to themselves as a company, is sufficient to show that they were copartners, although they had no articles or agreement of copartnership.

**3. SAME—SETTLEMENT BETWEEN PARTNERS—RIGHTS OF CREDITORS.**
A settlement between copartners, which determines their respective interests in a certain partnership fund, is conclusive as to the rights of their individual creditors to that fund.

4. SAME—VACATING SETTLEMENT—EVIDENCE.
   A settlement between copartners, who are both shrewd business men, of a business amounting to hundreds of thousands of dollars, and involving many items of account, depending upon the memories of the copartners, should not be opened at the instigation of their creditors, after the death of one of the copartners, even though there is a strong *prima facie* showing of mistake in the settlement.

5. SAME—RIGHT OF PARTNER TO PLEDGE FIRM PROPERTY.
   One of two copartners cannot pledge the partnership property to secure his private debt, except to the extent of his interest therein.

6. EQUITY PLEADING—AMENDMENT.
   After the announcement of the final decision of the chancellor upon the merits of a case, it is proper to refuse to permit the pleadings to be amended so as to meet objections which were raised at the hearing, two months before the decision was rendered, especially where such amendment would not affect the grounds on which the decision is based.

In Equity. Bill in the nature of a suit of interpleader brought by John Claflin and others, composing the firm of H. B. Claflin & Co., against Jessie I. Bennett, administratrix of Milton H. Bennett, deceased, and others.

*Kraus, Mayer & Stein*, for complainants.

*E. F. Thompson, Mason Bros., McCoy, Pope & McCoy*, and *Miller, Starr & Leman*, for defendants.

BLODGETT, District Judge. On the 26th of July, 1886, a judgment was rendered on the law side of this court in favor of Milton H. Bennett and Robert L. Dunman, said in the pleadings to sue as partners, under the firm name of Bennett & Dunman, against Edward M. McGillan, for the sum of $115,580.55, being a balance found due the complainants on the purchase price of a ranch, ranch outfit, and herd of cattle in the Indian Territory sold by them to McGillan. A writ of error was prosecuted by McGillan to the supreme court, in which proceeding he gave a *supersedeas* bond, signed by Jesse Spaulding and George M. Pullman. This judgment was affirmed by the supreme court, (10 Sup. 122,) and, after the affirmance of the judgment, this bill was filed by the complainants, composing the firm of H. B. Claflin & Co., of New York city, which alleged, in substance, that Spaulding and Pullman had signed the *supersedeas* bond in the matter of the writ of error at the request of the American Surety Company, and that such request had been made at the request of complainants, and that complainants were in law and equity the final indemnitors for said McGillan on said bond, and liable for any and all amounts which might be recovered against him, the said McGillan having become insolvent; that divers assignments had been made by the said Milton H. Bennett and Robert S. Dunman of said judgment, or parts thereof, to various persons; that they (complainants) were ready, able, and willing to pay into court the total amount of such judgment; and prayed that they be allowed to so pay the sum into court, and that they be subrogated to all the rights of persons having interest in the claim to said judgment. All the persons and corporations who appeared by the record of this court to hold assignments of an interest in the judgment were made parties, and appeared and answered. The bill was subsequently amended, and on the 23d of April, 1890, a

decree was entered allowing the complainants to pay into court the sum of $122,194.42, which was the balance due on said judgment after paying certain undisputed costs and liens; and the complainants were released from all liability as indemnitors of Spaulding and Pullman and McGillan. It was further ordered that the defendants to said bill be allowed to file such amended and supplemental pleadings as shall be necessary to secure a proper adjudication of their respective rights to the money so paid into court, and to secure a proper distribution thereof. Afterwards an order was entered requiring all persons making any claim to the fund, so in court, or any part thereof, to file a statement of the same, with proofs, by the day fixed by said order; and by said order notice was required to be published in two newspapers designated in the order.

In pursuance of these decrees and orders various claimants to the fund presented their claims, mainly in the form of answers to the bill, by which it appeared that, in addition to the amount paid into court by the complainant Claflin and others, there had also been paid into court the sum of about $9,183.50, together with the commission payable in such cases, in satisfaction of a garnishment proceeding in the original suit of Bennett & Dunman against McGillan. Many of these claims were undisputed, and orders were made from time to time by consent for the payment of such claims as were not contested, by which payments the total fund in court has been reduced to the sum of $60,658.79, and the contentions over this balance, as between the several interpleaders, are as follows: (1) McCoy, Pope & McCoy claim for services as attorneys of Bennett & Dunman in the suit brought by one Baker against them for commissions for negotiating the sale of the ranch and cattle to McGillan, $1,250; and $350 for services as attorneys for Bennett & Dunman in a suit brought by them against McGillan on a note for $75,000, given them by McGillan for part of the purchase money of the ranch property. But that was not the suit taken to the supreme court, and on which the money, now in question, was paid into court. (2) A balance claimed to be due the Stock Exchange Bank of Caldwell, Kan., of about $3,000. (3) A claim of Gregory, Cooley & Co. for amount due on a note of $10,000 given them by Bennett, dated in December, 1884, and which Bennett assumed to secure by the assignment of this judgment against McGillan to Charles H. Moore, trustee. (4) A claim of John A. Blair for the sum of $6,000, paid by him as surety for Bennett to the Cherokee Strip Association, also secured by the assignment of the judgment to Moore. (5) Claim of Samuel J. Garvin against Bennett for $40,000, which he insists is secured to him by an assignment from Bennett of Bennett's interest in the judgment against McGillan. (6) Claim of John C. Harrison, who, by an assignment from Dunman, insists that he is entitled to all Dunman's interest in the McGillan judgment.

The claim of McCoy, Pope & McCoy, I am satisfied, is a proper claim against this fund. It is for meritorious services rendered as attorneys to Bennett & Dunman in litigation growing out of the sale of the ranch and

cattle to McGillan, and I have no doubt that, at the time the services were rendered, they looked to this large claim against McGillan as the fund from which they would be paid. If they had not relied upon being paid out of the proceeds of the McGillan judgment, they would probably not have rendered these services, or would have collected their pay at the time the services were rendered. These two claims aggregate $1,600, and are allowed for that amount. As to the claim of the Stock Exchange Bank of Caldwell, Kan., I am satisfied from the proof that it was a copartnership claim of the firm of Bennett & Dunman, and should be paid out of this fund, but charged against Bennett's interest in the judgment. It is therefore allowed to the amount of $3,000, (subject to correction as to amount, as the proof does not accurately show, but simply states, that it is about $3,000.)

The chief controversy in the case is over the claims filed by Gregory, Cooley & Co., John A. Blair, Samuel J. Garvin, and John C. Harrison. Gregory, Cooley & Co., Blair, and Garvin are individual creditors of Milton H. Bennett, and base their claims to payment out of this fund on transactions between themselves, respectively, and Bennett. As to the Gregory, Cooley & Co. and Blair claims, the proof shows that on the 29th of December, 1885, Bennett, in the name of the firm of Bennett & Dunman, assigned to Charles H. Moore, as trustee, the claim of Bennett & Dunman against McGillan, then in suit, and which afterwards ripened into the judgment, to secure an indebtedness due from the firm to the Stock Exchange Bank of Caldwell; and by a paper executed by Bennett, in the name of the firm, on the 26th of January, 1886, he directed Moore, the trustee, to pay out of the proceeds of the McGillan claim, after paying what was due the Stock Exchange Bank, whatever indebtedness should be due to Gregory, Cooley & Co. from Bennett, and also whatever amount should be due from Bennett to the Cherokee Strip Association, or Blair as surety for Bennett to the association, and this order was confirmed by a further instrument executed by Bennett after the rendition of the judgment in this court against McGillan. There is no dispute that these two claims are the individual indebtedness of Bennett, and that if his interest is sufficient in the judgment, after the payment of the claims chargeable against the 'ind as copartners, they might properly be paid out of the fund, to the extent of Bennett's individual interest in the judgment. Garvin claims by an assignment of the balance of Bennett's interest in the judgment, dated September 22, 1886, which assignment was really given to secure a note of $50,000, held by Garvin against Bennett, and for which Bennett was individually liable. Gregory, Cooley & Co., and Garvin also, base their claims upon the position that the notes held by them, respectively, against Bennett were given for purchase money of part of the cattle sold by Bennett & Dunman to McGillan, and that, by the custom of the Indian nation, the seller of cattle had a lien upon them, and they insist that their lien follows the proceeds of the cattle, and attaches to the fund now in court. Harrison's claim is based upon an assignment to him by Dunman of all Dunman's interest in the judgment, which assignment is

dated October 8, 1887. This claim of Harrison to Dunman's interest in the judgment also appears to be merely as security for indebtedness due from Dunman to Harrison.

The proof shows that, on the 16th day of December, 1886, Bennett & Dunman had a full settlement of their business dealings with each other, including this McGillan judgment, which resulted in a specific agreement in writing in which Bennett admits that he is indebted to Dunman in the sum of $39,055, and to secure the same assigns to Dunman that amount in the proceeds of the McGillan judgment when collected; that is, the settlement resulted in an agreement that the interest of Dunman in the judgment was $89,855, and the interest of Bennett was fixed at $25,745; treating the judgment at its face, and in that proportion of what should be actually collected. It is clear from the proof that this settlement was intended to be a complete adjustment of all the business affairs between these parties, and that the apportionment to each of his share in this judgment was intended to be a division of the partnership assets, upon a basis fixed by this settlement. The settlement agreement contained this clause:

"It is further agreed between the parties that each have accounted in this settlement for all notes and bonds for which the said Bennett & Dunman as a company are liable."

Gregory, Cooley & Co. and Garvin have put into the record a great deal of testimony for the purpose of showing—*First*, that part of the cattle sold by Bennett & Dunman to McGillan had been purchased of Hewins & Titus by Bennett, for which Bennett gave the note now held by Garvin, and that by the custom of dealing in the Indian nation a lien attached to these cattle for the purpose of securing the payment of the paper given for the purchase money, and, further, that there was a specific verbal pledge by Bennett of the cattle to secure the payment of the purchase money; *second*, that Bennett & Dunman were not partners, but only owners in common of the ranch property and cattle sold to McGillan. From a careful reading of the proof, I am constrained to say that I do not think it is shown that any such lien was understood to exist or follow cattle sold as is contended for. What I mean is that, while there may have been a usage or understanding of that kind, it is of so shadowy and unsubstantial a nature as to work no substantial right to enforcement by the courts. I also conclude that Bennett & Dunman were partners as to the ownership of the ranch and cattle sold to McGillan. The proof shows that Dunman owned one half of the ranch, and cattle then on it, and that in December, 1883, Bennett bought out the interest of Hewins & Titus, who owned the other half, and from that time on to the sale to McGillan, in April, 1885, Bennett & Dunman managed the ranch and cattle as partners. They do not appear to have had any articles or agreement of copartnership, but the conduct of their business and their methods, so far as they can be got at from the proof, show that they considered themselves as copartners. Their accounts with commission men, to whom they shipped cattle, were kept and rendered in the part-

nership name of Bennett & Dunman; bank accounts were kept and checks drawn in the firm name; and the last clause of the settlement, from which I have just quoted, shows that they, each of them, considered that their relations with each other had been that of partners. Taken altogether, the testimony leaves no doubt upon my mind that these two men not only acted as partners, but considered themselves as such to such an extent as would estop them both from denying their partnership, and would also work an estoppel as against either of these claimants to the fund. Being partners, there is no contention that they had not the right to settle the partnership affairs, and determine by such settlement their respective interests in the assets of the firm, including this judgment. As against the creditors of the firm they could not defeat their right to be paid out of the assets, but, as between themselves and the individual creditors of each of them, they could settle what interest each had in any and all assets.

Much stress is laid by the attorneys for Garvin upon the testimony of Mr. McCoy in the case, in which it is stated that Dunman denied that they were ever partners; but the circumstances under which that statement was made throw such light upon the matter as to clearly show, to my own satisfaction, that Dunman's statement must be taken as a denial that he was a partner with Bennett in the purchase of the cattle from Hewins & Titus. Just what relation Dunman and Hewins & Titus had borne towards each other in the management of the ranch and cattle is not very clearly disclosed by the testimony, nor is it material. It is sufficient to say that the proof does show that Bennett bought Hewins & Titus' interest in the ranch and cattle, then on the ranch, and that from the time he bought into the business he and Dunman conducted the business of the ranch as partners. I am therefore of opinion that, without regard to the priority of dates of some of these assignments made by Bennett, they were all made subject to the right of Bennett and Dunman to determine between themselves what their respective interests were in this judgment, and settled the interest they have in the fund in court which is the proceeds of the judgment. Mr. Bennett's individual creditors can claim no interest in this judgment except what belonged to him on an accounting with his partner, Dunman.

It is further charged in the answer of Garvin that the settlement was void by reason of fraud on the part of Dunman, and also that the same should be set aside on account of gross mistakes therein, and a great deal of proof has been adduced for the purpose of showing such mistakes. It is not contended that the proof shows any fraud was practiced on the part of Dunman in obtaining this settlement or securing the result, the only position urged being that mistakes were made which, if corrected, would widely vary the result, and show Bennett to be entitled to a much larger interest in the judgment than the settlement determined. The proof shows that this settlement was made after careful preparation both by Bennett and Dunman; that they called in the services of a well-known and able lawyer,—one in whom they both had confidence; that no books of account were kept by the firm, and that neither

of them pretended to keep a set of regular account books.　They were cattle dealers and ranch men.　Both, apparently, clear-headed, bright men, with no special education.　They kept their accounts with each other and the business largely in loose memoranda and vouchers, and the court will assume that, like most unlearned men, who by their shrewdness and business capacity have been successful in the acquisition of property and the management of their affairs, their memories had become so trained as to enable them to keep a general idea of their business affairs in mind, without regard to books or bookkeeping.　They came together for the purpose of settlement, and, after several days of comparison of such vouchers and memoranda as they had, they arrived at the result which is shown in their written agreement.　They had each bought and sold large numbers of cattle in the common interest, so that the aggregate transactions, which had passed through the hands of each, amounted to hundreds of thousands of dollars.　Just how these various amounts were considered and dealt with by the parties, it is impossible now to make clear.　Mr. Dunman, and the friend who assisted them, (Mr. Bennett being dead,) both confess their inability, at this late day, to recall the details of the settlement.　All this is not surprising.　That any one, after this settlement was made, by groping about among the fragmentary *data* now accessible, shall be able to arrive at a more correct result than was reached by the parties themselves seems hardly possible.　Because we cannot see just how the parties arrived at the result is no evidence, to my mind, that the parties to this settlement did not fully understand it, or that any mistakes had been made.　Undoubtedly, both parties were most materially helped by their memories, and no trace is left of what they thus recalled and acted upon.　Each had paid out money in the purchase of large droves of cattle, and each had received large sums of money from the sales of cattle.　When one item balanced the other, no figures were made in regard to them.　It is true, there is some proof in the case tending to show that Bennett said he was disappointed in the result, and that Dunman had got the best of the settlement.　He may, until brought face to face with such figures as were produced, have had an impression that his interest was larger than it was found to be; but he acquiesced in it, and took no steps, after the settlement was made, to set it aside, although he lived over three years after that time.　It also appears that he was deeply in debt (insolvent) at the time of the settlement, and from then on to his death.　These expressions in regard to the settlement may have been made by way of exculpating himself to his creditors, or because he was in fact disappointed, and the result was, to some extent, different from what he had expected.

It is urged that the proof shows that Bennett remitted from Kansas to Dunman, in Texas, the sum of $12,000 at one time, $10,000 at another, and $20,000 at another, of which no trace is found in the memoranda of this settlement.　And it is insisted that this large mistake was made against Bennett in the settlement.　That small sums may have been overlooked or forgotten, in such a settlement between such men, is not

only possible, but probable; but it is inconceivable that two shrewd men, with their wits about them, and their memories trained as these men's must have been, could have overlooked sums which, in the aggregate, amount to $42,000, a small fortune of itself.

Upon this point a quotation from the opinion of Chancellor WALWORTH in *Wilde* v. *Jenkins*, 4 Paige, 494, seems to me appropriate:

"I may also state, from an examination of the books and from other evidence in the case, that both parties understood it to be a full and final adjustment of the partnership concerns up to that time. It must therefore require very strong and conclusive evidence of error or mistake to induce the court to open the accounts, or go back beyond the adjustment thereof, in June, 1847. The modes of keeping accounts are so various that it is difficult for third persons to understand them in many cases, with all the lights which evidence in the case can throw upon recent transactions. The practice of opening accounts, therefore, which parties who could best understand them have themselves adjusted, is not to be encouraged, and it should never be done upon the mere allegation of errors, supported by doubtful or even probable testimony only; especially where the parties to the settlement stand upon terms of perfect equality, so that there could be no pretense of fraud or imposition practiced by one party upon another."

In *Brydie* v. *Miller*, 1 Brock. 149, it was said by Chief Justice MARSHALL:

"Doubtful, or even probable, testimony is not sufficient to open a long-settled account, in the absence of proof of fraud or undue influence. The proof must be such as to leave no doubt of the party's ignorance."

So, also, it was said by the supreme court of the United States in *Chappedelaine* v. *Dechenaux*, 4 Cranch, 305:

"No practice could be more dangerous than that of opening accounts which the parties themselves have adjusted, on suggestion supported by doubtful or only probable testimony."

It seems to me, therefore, that in the attempt to open the accounts between these parties, and readjust them, at this late day, the court would be in greater danger of doing injustice than to leave the settlement where the parties left it.

As to the claim that a lien exists upon this money by reason of any special or expressed pledge of the cattle bought from Hewins & Titus by Bennett, I deem it enough to say that, in any event, that pledge could only reach Bennett's interest in the cattle, or the money they produced, and Dunman's interest in the judgment or the copartnership assets cannot be affected by it. But I may also add that the record is barren of proof that any of the money now in court is the proceeds of those cattle. Cattle had been sold off the ranch, and others had been bought to replace them, for two years before the sale to McGillan, and it is hardly probable that any of the cattle that were purchased from Hewins & Titus passed to McGillan, or are represented by the money now in court.

As to the same point made in behalf of Gregory, Cooley & Co., it is sufficient to say that Mr. Bennett had no right to pledge the cattle of the firm for his private debt, and that Dunman's interest in the partnership assets cannot be depleted or reduced by his attempt to do so.

By the settlement between the parties, Bennett was to pay the amount due the Stock Exchange Bank of Kansas as a personal indebtedness of Bennett's; $15,000 has been paid by consent of all parties out of the fund in court to the bank, and $3,000 is the balance claimed. This, of course, comes out of Bennett's share of what is left of this fund in court, if any is left. I have not been advised, and the proof does not show, how much of the various amounts which have been, by agreement of parties, drawn out from time to time was in payment of individual indebtedness of Bennett, further than this $15,000 to the bank. If, however, there is enough money left, upon the basis of the respective interests of Bennett and Dunman in the judgment, to pay either of these claims, they should be paid in the following order, after deducting from the undivided money the amount allowed to McCoy, Pope & McCoy, $1,600: If anything is left belonging to Bennett, if he still has any share in the judgment, then the indebtedness of the bank should be paid out of Bennett's share of the judgment. If Bennett's interest in the judgment as fixed by the settlement is exhausted, then it must be deducted from the undivided fund, because it was a partnership debt, as between the bank and the firm. If anything is left after that payment, then the indebtedness to Gregory, Cooley & Co., and, after that, anything that is due to Blair and Garvin, in the order named, as the assignees of Bennett's interests should be paid in the order of their date. The proportions of the parties should be observed, as the fund is depleted by these payments, charging to each whatever was his individual indebtedness. The proof shows that Dunman has received $38,864.70,—that is, payments have been made as of his individual indebtedness out of the fund in court to that amount; the items being to Peak, administrator, $28,864.70; and to Harrison, $10,000. From this *data*, and from what I have said, counsel will be able, I think, without reference to a master, to compute the amount now due Dunman, and the amount which should be paid to him from the fund in court, and the amount, if any, due to Bennett, and which should be paid, in the order of priority—*First*, to the bank; *second*, to Gregory, Cooley & Co.; *third*, to Blair; and, *fourth*, to Garvin.

### MEMORANDA.

On reading the foregoing opinion on the 8th of June inst., in the presence of all the counsel in the case a motion was made in behalf of Gregory, Cooley & Co., John A. Blair, the Cherokee Strip Live Stock Association, and Samuel J. Garvin, for leave to amend their respective pleadings so as more specifically to state the mistakes on which they relied as their grounds for setting aside the settlement made between Milton H. Bennett and Robert L. Dunman, on the 16th of December, 1886, by which the respective interests of Bennett and Dunman in the fund in court were settled and agreed upon. While it is undoubtedly within the discretion of a court of equity to allow amendments of the pleadings at any stage of the case before the entry of a final decree, I am satisfied that this discretion should not be exercised in this case for the following rea-

sons: *First*. The point that the allegations of mistakes in the settlement between Bennett and Dunman were not sufficiently specific was urged by the counsel for Dunman, and Harrison, his assignee, and authorities cited in support of the position at the hearing of the case in April last, and yet no request for leave to amend was made at that time or afterwards, until the announcement of the final decision of the court upon the merits of the case. *Second*. I was of opinion that the point of want of particularity in the allegations of mistakes should have been taken at an earlier stage in the case, and that the objection of want of particulars came too late at the hearing, when all the testimony had been taken. Entertaining this view of the objections, I looked fully into the proofs in the record upon the allegations of fraud and mistake in the settlement, and came to the conclusion that no such fraud or mistake is shown in the case as justified the court in setting aside the settlement, and ordering a new accounting between the parties; the reason for this conclusion being given in the original opinion. *Third*. To allow amendments at this stage of the case, when it is ready for final decree, might make it necessary to allow amendments on the part of Dunman and Harrison, and thus prolong a litigation which has already been expensive and exhausting in its delays to even the successful party. As I have already said, I have no doubt, from the fragmentary *data* now available, perhaps a strong *prima facie* showing of several mistakes against Bennett in the settlement might be made. But it is equally evident to me that much of the *data* acted upon by the parties in making the settlement is now unavailable, and that to rehash the arguments pro and con would be a waste of time for counsel and court. An order will be entered overruling the motion, to which counsel can save an exception if they wish, and the clerk is directed to note such exception at the foot of the order.