MELLWOOD DISTILLING CO. v. HARPER et al.

(Circuit Court, W. D. Arkansas, Ft. Smith Division. December 9, 1908. On Motion to Amend, January 29, 1909.)

1. TRADE-MARKS AND TRADE-NAMES (§ 60*) — INFRINGEMENT — IMITATION OF NAME AND LABELS.

Complainant and its predecessors in business for 50 years had owned and conducted a distillery at Louisville, Ky., known as the "Mellwood Distillery," and had made and sold a brand of whisky under the name "Mellwood" as a trade-mark, by which it became widely and favorably known as a high-grade whisky and attained a large sale. Defendants, who were dealers in liquors, caused labels to be prepared similar in general appearance to those used by complainant on its bottles, which they placed upon bottles of cheap whisky sold by them. Such labels contained the names "Mill Wood" and "Kentucky," a picture of a large distillery having the name "Mill Wood Distilling Co." thereon, and statements to the effect that the contents was a celebrated handmade sour-mash whisky bottled after being matured in barrels for eight years, etc., all of which representations were false, the fact being that there was no such distillery nor company, that the whisky was not celebrated, nor a handmade sour-mash, but was a cheap blend put up by defendants. Held, that such labels were clearly intended and calculated to mislead the public into the

---

belief that the whisky so labeled was complainant's, and constituted infringement of trade-mark and unfair competition, which entitled complainant to equitable relief by injunction and otherwise.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 74; Dec. Dig. § 60.*]

**2. EQUITY (§ 118*)—PLEADING—AMENDMENTS.**

It is within the discretion of the court to permit the correction by amendment of a clerical error in the name of a corporation complainant, both in the caption and body of the bill, even after the case has been tried on the merits and a decision handed down, where no prejudice can result to defendant, and where no plea in abatement was filed, but the answer went to the merits.

[Ed. Note.—For other cases, see Equity, Dec. Dig. § 118.*]

In Equity. On final hearing.

Hopkins & Eicks, James L. Hopkins, and Read & McDonough, for complainants.

Youmans & Youmans, for respondents.

ROGERS, District Judge. The bill in this case was filed by the Mellwood Distilling Company, a corporation organized under the laws of the state of West Virginia, and having its principal place of business in the city of Louisville, in the state of Kentucky, against Samuel R. Harper and Cyrus F. Reynolds, citizens and residents of the Ft. Smith division of the Western district of Arkansas, partners, doing business under the firm name of the Harper-Reynolds Liquor Company, and alleges that complainant is the sole and exclusive owner of a certain trade-mark for whisky, consisting of the word "Mellwood," which has been applied to whisky by the complainant and its predecessors since 1855; that said trade-mark has been applied to whisky by being marked or branded upon packages containing the whisky, or containing the bottles in which said whisky was contained, when bottled, and by the same being imprinted upon labels affixed to bottles containing the whisky; that whisky bearing the trade-mark "Mellwood" has been extensively sold throughout the United States, and particularly in the state of Arkansas, and has been extensively advertised by complainant throughout the United States; that said trade-mark is an integral part of the good will of the complainant, and is one of its principal assets, and is of large value; that the whisky to which said trade-mark is applied is of superior excellence and of uniform quality, and that its reputation for such excellence and quality is owing to the labor and expenditure of money by the complainant and its predecessors, extended throughout the United States; that the value of the trade-mark is $500,000, and that complainant's right to be subjected to none but fair and lawful competition is of that value and upward; that complainant is the proprietor and sole owner of distillery No. 34, Fifth internal revenue district in the state of Kentucky, and said distillery is known as the "Mellwood Distillery." The bill then alleges that the defendants, well knowing these facts, on the 2d of January, 1905, and has continuously since, availed themselves of the reputation of said whisky designated by said trade-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

mark, fraudulently intending to invade complainant's good will and divert its trade, made or caused to be made, or sold and caused to be sold, in the city of Ft. Smith, Ark., and elsewhere, a certain spurious liquor, not produced by complainant, to which they have caused the trade-mark "Mill Wood" to be affixed; that in and by said fraudulent traffic the defendants have diverted to themselves the trade of complainant, and have invaded its good will, and have instituted and maintained, and are now maintaining, a fraudulent and unfair competition with complainant. It further alleges that said whisky, to which the words "Mill Wood" have been affixed by the defendants, has been further marked and branded by them with the words "Kentucky Mill Wood Distilling Company," and complainant avers that there is not now, and never has been, in the state of Kentucky any distillery company doing business under the name of the "Kentucky Mill Wood Distilling Company," or "Mill Wood Distilling Company." It further avers that said names "Kentucky Mill Wood Distilling Company" and "Mill Wood Distilling Company" have been adopted and used by defendants solely for the purpose of fraud and deceit, in order to enable them to pass off their whisky as the whisky of complainant. The bill further avers that the whisky sold under this name by the defendants is not produced in Kentucky, and is a compound of spirituous coloring matter, and other ingredients, prepared by them in the city of Ft. Smith. It then avers, in substance, that this misconduct on the part of defendants has resulted to the complainant in the loss of the sales of its own whisky, and in great injury to the reputation of complainant's product; that said liquor has been bought by the public and consumers under the belief that they were purchasing complainant's whisky and that the same was deteriorating in quality. It then alleges no adequate remedy at law, and prays for an injunction perpetually enjoining the defendants and their privies from making, keeping, offering for sale, and selling any liquor not produced by the complainant bearing the mark or the words "Kentucky Mill Wood Distilling Company," "Mill Wood," or "Mill Wood Distilling Company," and for an account of gains and profits thus unlawfully made and received.

In short, the defendants deny all fraud and deceit, and all purpose upon their part to injure the complainant, or avail themselves of the brand of its whisky; and, to all intent and purposes, all the other allegations in the bill. They set forth and make a part of their answer the label which complainant used on the whisky it sold, and also a copy of the label on the whisky which they sold, deny any infringement, and insist that in the use of the words "Mill Wood" no deceit or fraud was practiced against complainant, and allege that none was intended. It can be of little use to set forth more fully the specific allegations in the answer. The facts upon which the case will turn will largely depend upon an examination of these labels, and the proofs in the case.

The following facts are uncontradicted: The "Mellwood Distillery Company" is a corporation organized under the laws of the state of West Virginia, and doing business at Louisville, Ky., where its principal office is located. It has owned, since July 21, 1902, the Mell-

wood Distillery, located at Mellwood and Frankfort avenues, Louisville, Ky., and it and its predecessors have owned the "Mellwood" brand of liquors since 1869, and it has remained in continuous use by them ever since. The "Mellwood" brand was well known to the trade, and its sales were large, and the very high grade quality of the whisky well established. The brand and good will of the business is estimated by the witnesses to be very large. About 10,000 barrels and 50,000 cases (some of the cases being filled out of the 10,000 barrels) were sold annually, and was manufactured at an annual cost of $200,000, and the distillery is estimated to be worth $600,000. The brand "Mellwood" was originated by the late George W. Swearingen, a farmer (who ran a small distillery on his farm, which he called "Millwood"), and after selling the farm he removed to Louisville, Ky., and engaged in the whisky business, and concluded to name this brand after the old farm, "Millwood," but by error of the man who made the brand the name was misspelled "Mellwood," which Mr. Swearingen concluded to adopt. By mesne conveyances, on July 21, 1902, the "Mellwood Distilling Company" became the owner of the distillery and all appurtenances, including the name "Mellwood," and has owned and used it since as a brand on its whisky.

The defendant Cyrus F. Reynolds testifies that prior to 1894 he was an employé of M. C. Wallace, a liquor dealer at Ft. Smith, Ark., who carried complainant's "Mellwood" brand of whisky in stock; that he first became familiar with it while an employé of said Wallace; that about that time his partner, Danner, and himself bought out Wallace, and they continued to carry the same brand, but did not buy it in bottles; that later Danner and himself dissolved, and he became a partner and a member of the firm of Harper Bros., who also had the same brand in stock. Later Harper Bros., was succeeded by defendants, and they too carried the same brand, and had it on the shelves when this bill was filed; that they also had in stock on the shelves the "Mill Wood" brand, which it is alleged infringes the "Mellwood" brand. Reynolds' explanation as to how he came to adopt the word "Mill Wood" as a brand is this: He says that a competitor in Dayton, Ohio, was shipping into their territory a four-quart package which he sold at $3.20 a package; that his firm could not compete with him with anything it had in stock; that he determined to get up a similar package with which they could compete with him, and accordingly made known their wish to the traveling solicitor of the Stevens Lithographing & Engraving Company, of St. Louis, Mo., who suggested to his firm the name "Mill Wood" as good brand; that the suggestion appealed to him, because that was the name of his old home in Indiana; that he adopted the suggestion, and ordered 5,000 labels through the solicitor; that the "Mill Wood" brand was gotten up by the solicitor after consultation with his firm, and when executed it was so sent out for his approval, which he gave, and then the labels followed, 5,500 in all; that he used about 3,400 of them on quarts, pints, and half pints, and destroyed the others when this bill was filed against his firm; that the liquor sold under this label was in four-quart packages, price $3.20, delivered, and some was sold in pints

and half pints from the shelves; that he had no idea of infringing the "Mellwood" brand; that it had never occurred to him; that he sold both brands at the same counter, but some 35 feet apart; that he never represented the "Mill Wood" as the "Mellwood" brand, and also that when 75-cent whisky was called for he offered the customer the "Mill Wood" and some other similar priced whiskies, and let him make his choice; that he never explained the difference between the two, and had no occasion to, as no inquiries were made as to that, and no information volunteered; that the "Mill Wood" brand sold at 75 cents per quart, and "Mellwood" at $1.25 per quart. Both liquors were sold in quart bottles, on which were pasted the respective labels. The "Mellwood" bottle is amber-colored and smooth; the "Mill Wood" bottle is clear glass, with fluted neck. They are the same size, and the labels approximately so, the "Mellwood" label being a little smaller, with rounded corners, while the "Mill Wood" label is square cornered, both being white. On the "Mellwood" label, at the top, in large, square, black letters, is the word "Mellwood." Immediately beneath, and in the center of the label, in a small red circle perhaps an inch in diameter, are the words "Kentucky's Mellwood Whiskey," in medium-sized red letters and within the circle, in smaller red letters, the words, "Trade mark. Fire doubled copper." On the left of the circle, in large black letters, are the words "Distilled and," and to the right of the circle, in the same sized black letters, the words "Bottled in bond." Underneath the circle, in large, square black letters, the word "Whiskey," and beneath that, in large script, "Mellwood Distillery Company, Louisville, Ky.," and beneath that, "Distillery No. 34, 5th District, Ky.," and beneath that, "Bottled in bond under Government supervision. Age and purity guaranteed by the U. S. Internal Revenue Stamp." The internal revenue stamp is over the top of the bottle, containing the usual inscriptions. The defendant's label has at the top, in square black letters of medium size, "Kentucky." Just beneath, in large, red script letters, "Mill Wood." Just beneath that is a picture of an extensive distillery, containing various small inscriptions upon it, "Mill Wood Distilling Co.," "Malt House," "Warehouse" and "Cattle Pens," and just beneath, and to the right and left, in medium-sized black letters, "Hand Made," and below that, in red letters of large size, "Sour Mash." Just beneath that are the following words:

"This celebrated whiskey is made exclusively by the sour mash fire copper process, employed only in the distillation of the finest whiskeys, from carefully selected grain, and bottled only after being matured in barrels for 8 years."

Beneath that the words "Mill Wood Distilling Co. Harper-Reynolds Liquor Co., Distributors, Fort Smith, Arkansas." The above is a fairly accurate description of the two labels.

It is admitted by Mr. Reynolds that, so far as he knows, there is no such distillery as the "Kentucky Mill Wood Distilling Company," or "Mill Wood Distilling Company"; that the whisky contained in the bottle is a blend. He does not claim that it is handmade, or sour mash, or that it is made by the "sour mash fire copper process," or that such process is used "only in the distillation of the finest whisky".

from carefully selected grain, and bottled only after being matured in barrels for 8 years." He does not claim that the whisky is eight years old, or even that "Harper-Reynolds Liquor Co. of Fort Smith, Ark.," were "distributors," of this whisky. He does not claim that the picture represents any distillery. It is established by the proof that there is no such distillery as this picture represents; that it was gotten up by the lithographing company, and placed upon the label simply as a part of it.

It thus appears that everything that enters into the make-up of this label used by defendants is untrue, except, perhaps, the word "Mill Wood," which appears to have been the name of the old home of defendant Reynolds. Even that, according to the proof, appears to have been suggested by the solicitor of the Stevens Lithographing & Engraving Company. If this label was gotten up by the Stevens Lithographing & Engraving Company, as contended, without design or purpose of infringing on complainants' trade-mark and label, it furnishes a most remarkable and singular coincidence. Had it been gotten up for that distinct purpose by some one familiar with the law governing such matters, such person would hardly have ventured nearer to an imitation of complainant's label. If the purpose had been to sell a spurious article to unsuspecting customers as the "Mellwood" brand, it may be considered a work of art. Unless defendants intended to infringe complainant's rights some one has gone to an unusual trouble in imitating their trade-mark and label for no purpose. It is a strain upon the court's credulity to ask him to accept the contention that this label, thus gotten up, was purely accidental. This label was intended to make it appear to the consumers that there was such a distillery as the "Kentucky Mill Wood Distillery," and such a company as "Mill Wood Distilling Company," that the distillery was located in Kentucky, that the whisky was put up there, that it was a very large distillery, and used the "fire copper process," that the whisky was "celebrated," and that the "fire copper process" was only used in the "distillation of the finest whiskeys, from carefully selected grain, and bottled only after being matured in barrels for 8 years," and that this whisky was of this character, and that the "Harper-Reynolds Liquor Company" did not put it up, but were "distributors" of it. What are the facts? There was no such distillery; the whisky was put up and owned by defendants at Ft. Smith, Ark., and was a blend, and certainly a cheap whisky; it was not put up by any fire copper process; it was not made in Kentucky; it was not celebrated; it was not made of selected grain; it was not matured eight years in barrels before being bottled; it was not distributed by the Harper-Reynolds Liquor Company; it was both owned and sold by that company; it was not sour mash; it was not handmade; the picture on the label of a distillery was not the picture of any distillery; the inscriptions on the picture were untrue. If any of these recited things were true, the proof does not show it, and the defendant did not know it. On the other hand, the "Mellwood" brand was a celebrated brand; it was a high-grade whisky; it was made by the fire doubled copper process; it was made in Kentucky; it was made by the "Mellwood Distilling

Company." All these facts were known to the trade and to the defendants. Here, at least, was a reason to inspire others to imitate its brand under which to sell a cheap blend of inferior whisky. I think the facts in this case justify me in holding that the label adopted by defendants is well calculated to mislead the public into the belief that in purchasing the "Mill Wood" brand of whisky they were purchasing complainant's whisky; and I think I am also justified in holding that the selection by the defendants of this brand "Mill Wood" was due to the fact that the "Mellwood" brand of whisky was well known to the trade as a high-grade whisky, and that complainant has built up a large trade in it.

This is unfair competition, and an infringement of complainant's rights, such as a court of equity will protect, without regard to the purposes defendants had in mind in adopting the label. In applying the test recognized by the authorities, i. e., the likelihood of deception of "an ordinary purchaser exercising ordinary care," regard must be had to the class of persons who purchase the particular article for consumption, and to the circumstances ordinarily attending their purchase. In determining whether packages are so dressed up as to be calculated to deceive purchasers, equity regards the consumer, as well as the middleman, for it is to him more than the jobber or wholesale purchaser that the various indicia of origin appeal; and the courts will not tolerate a deception devised to delude the consuming purchaser by simulating some well-known and popular style of package.

If the court was satisfied that the defendants' label was not devised with the view of appropriating the well-established reputation of complainant's whisky in order to sell their own, still, if the label adopted is of that character which is well calculated to mislead an ordinary purchaser, exercising ordinary care, it would be the duty of the court to grant the relief prayed, upon the ground that the label conveys a false impression to the public mind, and is well calculated to mislead and deceive the public. N. K. Fairbank Co. v. R. W. Bell Mfg. Co., 77 Fed. 869, 23 C. C. A. 554. The case at bar comes within the principle decided in Pillsbury-Washburn Flour Mills v. Eagle, 86 Fed. 608, 30 C. C. A. 386, 41 L. R. A. 162. A large number of cases have been cited by counsel on both sides. None of them militate against the conclusion reached, and nearly all of them sustain it.

An injunction will be granted restraining the defendants from the use of the label, as prayed in the bill, and the case will be referred to the master to ascertain the profits and the damages and for the costs of suit.

## On Motion to Amend.

The bill of complaint in this case was filed June 15, 1905, in the name of the "Mellwood Distilling Company." The answer was filed July 10, 1906. The delay was, no doubt, the subject of agreement by counsel to suit their own convenience. March 25, 1907, plaintiff filed depositions, to which its articles of incorporation were made an exhibit, and they show distinctly that the name of the plaintiff corporation was "Mellwood Distillery Company," instead of "Mellwood Distilling Company," in which latter name the suit was brought. Other

testimony was taken, and on December 4, 1908, the case was argued and submitted, and eight days afterward an opinion was handed down granting the relief prayed. Whereupon, for the first time, the court's attention was called to the discrepancy referred to in the name of the plaintiff corporation. Presumably it had been overlooked by counsel for both parties, as it had by the court. Thereupon the complainant filed a motion for leave to amend the bill of complaint in its caption and body by substituting the correct name, as shown by the articles of incorporation, and the defendant filed a motion to set aside the submission, and for leave to file a plea in abatement, which they tendered with their motion, and wherein they alleged that there was no such corporation as the "Mellwood Distilling Company," and urged that the bill should be dismissed.

Should the court allow the complainant to amend its bill of complaint by inserting its correct name? Proofs were taken, and the case prepared and tried, upon the theory that the name in which the suit was brought was the correct name. The name was correct, except the word "Distilling" was used for "Distillery." No one was misled or could have been prejudiced in the preparation of this case by this error. The original error was doubtless that of the plaintiff's counsel or stenographer. There could be no motive for the error, since nothing could be gained by it. It must be treated, therefore, as an inadvertence, or clerical mistake. The failure to discover it when the articles of incorporation were produced, filed, and read in evidence was an oversight of counsel, as it was of the court at the hearing. Had plaintiff discovered the error before any copy of the bill had been taken out of the clerk's office or answer filed, as a matter of right he could have made a correction without leave of court. The error was a mere misnomer, no plea in abatement or bar was filed, and the rules as to pleas were not observed. Equity Rules 31 to 33, inclusive. The defendant answered to the merits, and the case was tried accordingly. The case advanced to that stage without being brought to the notice of the court, where the rules make no provision for amendment, but the right to amend was not thereby lost.

It is a matter within the sound discretion of the court, and should only be exercised when no substantial prejudice would result by reason thereof. In Neale v. Neale, 9 Wall. 1, 19 L. Ed. 590, this question was before the court in a much stronger case than the one at bar. Mr. Justice Davis, delivering the opinion of the court, said:

"It would seem clear, from the manner in which the court below, of its own motion, and without assigning any reasons for this action, gave the complainants leave to amend their bill, that on the original hearing it was satisfied that the evidence made out a case for relief, but a case different from the one stated in the bill, and that, as the pleadings must correspond with the evidence, it was necessary either to dismiss the bill without prejudice, or to give them leave to amend. The court adopted the latter alternative, doubtless with a view to save expense to the parties, and because such a course could not, by any possibility, work any harm to the defendants.

"It is insisted that this proceeding is erroneous; that, after a cause has been heard, the power of allowing amendments ceases, or, if it exists at all, it cannot go so far as to authorize a plaintiff to change the framework of his bill, and make an entirely new case, though on the same subject-matter, as, it is contended. was done in this instance under the leave to amend.

"This doctrine would deny to a court of equity the power to grant amendments after the cause was heard and before decree was passed, no matter how manifest it was that the purposes of substantial justice required it, and would, if sanctioned, frequently embarrass the court in its efforts to adjust the proper mode and measure of relief. To accomplish the object for which a court of equity was created, it has the power to adapt its proceedings to the exigency of each particular case; but this power would often be ineffectual for the purpose, unless it also possessed the additional power, after a cause was heard and a case for relief made out, but not the case disclosed by the bill, to allow an alteration of the pleadings on terms that the party not in fault would have no reasonable ground to object to. That the court has this power, and can, upon hearing the cause, if unable to do complete justice by reason of defective pleadings, permit amendments, both of bills and answers, is sustained by the authorities.

"Necessarily, in a federal tribunal, the matter of amendment at this stage of the progress of a cause rests in the sound discretion of the court. At an earlier stage, this discretion is controlled by the rules of equity practice adopted by this court; but not so upon the hearing, for there is no rule on the subject of amendments applicable to a cause which has advanced to this point. As, therefore, the leave to amend in this instance was within the discretion of the court, we will proceed to dispose of the case on its merits."

That case was affirmed.

In Nellis v. Pennock Mfg. Co. (C. C.) 38 Fed. 379, the Circuit Court of the United States for the Eastern District of Pennsylvania had the question before it as to whether or not the plaintiff should be allowed to amend his bill by including an additional claim inadvertently omitted, and after the evidence on which it rested had been mainly taken. Butler, J., said:

"I have no doubt of the power to allow the proposed amendment to the bill. Such an amendment is not contemplated by the rules prescribed by the court, governing amendments generally. Tremaine v. Hitchcock, 23 Wall. 518, 23 L. Ed. 97; Neale v. Neale, 9 Wall. 1, 19 L. Ed. 590; Mitf. Eq. Pl. 326, 331; Story, Eq. Pl. §§ 904, 905; Daniell, Ch. Pr. 436, 466; McArtee v. Engart, 13 Ill. 242. It is quite clear that the claim covered by the amendment might have been joined originally in the claim embraced in the bill. Henry v. Soapstone Co., 2 Ban. & A. 221, Fed. Cas. No. 6,382; Packer Co. v. Eaton (C. C.) 12 Fed. 865; Spring v. Sewing-Machine Co. (C. C.) 13 Fed. 446; Grim's Appeal, 105 Pa. 375; Hoyt v. Sprague, 12 Chi. Leg. N. 25; Sage v. Woodin, 66 N. Y. 578; Kimball v. Lincoln, 99 Ill. 578; Id., 5 Ill. App. 316; Brooks v. Brooks, 12 Heisk. (Tenn.) 12; Mead v. Raymond, 52 Mich. 14, 17 N. W. 221. The claim was omitted by oversight. The evidence, however, on which it rests has been mainly taken. If the amendment was not allowed, the parties would be subjected to delay and expense, with no possible advantages to either of them. It will therefore be allowed, subject to any defense which defendant might have presented if the claim had been embraced in the bill when filed. If additional costs result from the omission to so embrace it, they will be placed on the plaintiff."

In Verplanck v. Mercantile Insurance Co., 1 Edw. Ch. (N. Y.) 47, the prayer in the original bill is against the "President and Directors of the Mercantile Insurance Company of New York," whereas the style of the company, by the act of incorporation, was "The Mercantile Insurance Company of New York." An injunction was granted and a receiver appointed, and the property of the Mercantile Insurance Company of New York was taken from it when it was not a party defendant in the bill, and the process of the court was only against the officers of the corporation. This order was made by the vice chancellor. On appeal the chancellor reversed the order of the court be-

low, and the appointing of the receiver was vacated, but permission was given to the plaintiff to apply to the vice chancellor to amend the bill of complaint so' as to make the corporation of the Mercantile Insurance Company of New York defendant in the bill, and otherwise as they might be advised, and upon due notice to apply to the vice chancellor for an injunction and a receiver.   In that case the court said:

"If, then, as respects amending an answer, the court is to be thus watchful to prevent anything from being stricken out, though introduced unintentionally and through mistake, is it not necessary to be equally particular in regard to a sworn bill which a complainant may seek to amend in an important and material part?  In some respects, the comparison may not hold good; for the occasions are much more frequent for amending bills than answers, and therefore a greater latitude should be given in the former cases.  Yet it will be perceived that the occasions for amending bills, in which it is necessary to exhibit a greater indulgence, generally arises from a discovery of a defect in the proper parties, in the prayer for relief, or in the omission of some fact or circumstance rendered necessary to be introduced in consequence of the defendant's answer (and which a complainant may be permitted to introduce, especially where the defendant, upon exceptions, is bound to make further answer), and where the matter for amendment does not affect the substance of the case made by the bill.  Where the object of the amendments is to alter or change the substance of the bill, I hold that the same strictness should be required as where an answer is in question.  The complainant may amend by introducing new parties, and by making such new charges, allegations, and statements, in addition to the former, as he can verify by his oath, and which are not inconsistent with his former allegations.  These are the true and legitimate purposes for which leave to amend may be granted; and it cannot be extended, with any sort of propriety, to the striking out of former allegations and substituting others, although they may not be very different in substance and effect."

This case was approved in the case of Shields v. Barrow, 17 How. 143, 15 L. Ed. 158.

In 1 Enc. Pl. & Pr. p. 482, par. 4, the author says:

"If the plaintiff has occasion to amend his bill after replication merely by adding new parties, he may obtain leave to do so as a matter of course.  Orders of this nature may be obtained without withdrawing the replication."  2 Story, Eq. Pl. (10th Ed.) § 887.

"The bill may be amended after witnesses are examined, where the substantial allegations are not changed."  Baggott v. Baggott, Hoff. Ch. (N. Y.) 377.

"The power of the court to order an amendment, even on the final hearing, is unquestionable, but it is a power never exercised except where the ends of justice render it absolutely necessary, and its exercise will not substantially impair or prejudice the rights of the defendant."  Ogden v. Thornton, 30 N. J. Eq. 569.

"A bill was directed to be amended after a final hearing so as to make the contract alleged agree with that proved in a bill for specific performance."  Davison v. Davison, 13 N. J. Eq. 246.  See, also, Lanning v. Heath, 25 N. J. Eq. 425.

"In the case of the Tremolo Patent, 23 Wall. 518, 23 L. Ed. 97, the plaintiff filed a bill to restrain the infringement of a patent, and after final decree he was permitted to amend by setting up a reissue of the patent, which had not been set out in the original bill, contrary, however, to the supposition of both parties through the whole progress of the trial.  The court conceded that the case was anomalous, but declared that the amendment might 'well be denominated only an amendment of form, because it introduced no other cause of action than that which had been tried.'"  See Claflin v. Bennett (C. C.) 51 Fed. 693.

"A mere clerical error in a bill may be amended after final decree." Donnelly v. Ewart, 3 Rich. Eq. (S. C.) 18.

The author of the Encyclopedia of Pleading and Practice, vol. 1, par. "b," p. 474, states the rule in this way:

"The usual tests are whether the original and amended bills found the right of complainant to relief on different and inconsistent titles, or upon entirely inconsistent claims arising out of differing states of facts; or whether the same defenses are applicable; or whether the kind and character of relief, not the degree or extent, proper to one state of facts, is inappropriate to the other; in other words, whether the matters of the original and amended bills could have been properly stated in the alternative in the original bill."

If the bill in this case had originally been brought in the correct name of the plaintiff, the court is unable to see even any probability that it would have taken any other or different course, or required any other or different proof, or that it could have reached any other or different result than has already been reached. It seems to the court that the error is purely clerical, and that the substantial ends of justice require that the court should permit the amendment sought. Even in common-law cases the Supreme Court of the United States in Baltimore & Potomac Railroad Company v. Fifth Baptist Church, 137 U. S. 568, 11 Sup. Ct. 185, 34 L. Ed. 784, held that a mere misnomer of the corporation plaintiff is pleadable in abatement only, and is waived by pleading to the merits. There was no proper plea in abatement filed in this case, but the answer went to the merits, and therefore the matter of misnomer was waived. See also, Michigan Insurance Bank v. Eldred, 143 U. S. 293, 12 Sup. Ct. 450, 36 L. Ed. 162. The motion of the plaintiff to amend will be allowed, and the motion of the defendant to set aside the submission of the case, and for leave to file a plea in abatement, will be denied. The defendants, if they so elect, may amend their answer by making it apply to the amendment made in the complainant's bill, and the amendments in each case may be made by a proper record entry. The costs incident to making these amendments will be taxed to the complainants.

It is so ordered, and, when the amendments are made, the case will be referred to the master, in conformity to the original opinion.