## NEALE v. NEALES.

1. In the absence of obligatory rules of court to the contrary, a court of equity, after a cause has been heard and a case for relief made out, but not the case disclosed by the bill, has power to allow an amendment of the pleadings on terms that the party not in fault has no reasonable ground to object to.

2. And this amendment will be allowed on a bill for specific performance, where the subject-matter and general purpose of both bills is the same, and the contract, consideration, promise, and acts of part performance, stated in the amended bill, are stated with sufficient precision, and are supported by proofs, taken under the original bill, which entitle the complainants to the relief which they seek.

3. Equity protects a parol gift of land equally with a parol agreement to sell it, if accompanied by possession, and the donee, induced by the promise to give it, has made valuable improvements on the property. And this is particularly true where the donor stipulates that the expenditure shall be made, and by doing this makes it the consideration or condition of the gift.

4. The principle applied in the case of an antenuptial parol promise, by a father, to give to a lady about to marry his son (an improvident person), a lot of ground, she promising at the time to lay out her own money in building a house upon it, for the benefit of herself and family; and where possession was delivered and the house was so built, but the father refused to convey the lot.

5 In case of an alleged contract, by a father, of this kind, reasonable certainty as to the fact and terms of it is all that equity requires.

6. The breach of such a contract is not to be compensated by damages, nor is the purpose of the contract so answered. It is a case for specific performance.

APPEAL from the Supreme Court of the District of Columbia; the case being thus:

Benjamin Neale and wife filed a bill in the court just named, against John E. Neale, father of the said Benjamin, stating that, he the father, was, in 1858, owner of lots Nos. 16 and 18 in Washington; that at the time mentioned, he, the son, one of the complainants, was seeking the hand of Mary Hamilton, the other complainant, and his now wife, in marriage; that this intended marriage met with the approval and encouragement of the father, who, in promotion thereof, and as an inducement thereto, promised and agreed that if said marriage should be consummated, he would, in consideration thereof, convey one, or a part of one, of the lots owned by him to *his son*, and Mary, his intended wife, *or to one of them*, in fee, to the end that with money then belonging to, or expected to belong to the intended wife, *they* might erect thereon a dwelling-house for *their* habitation and home; that confiding in the promise so made, and influenced thereby, and *partly* in consideration thereof, the said Benjamin and Mary did intermarry in September, 1858; that at or immediately after the marriage, the said father, mindful of the promise he had made, and with reference thereto, declared that he had given to his daughter-in-law, Mary, a lot in Washington on which to erect a dwelling-house for herself; that shortly after the marriage, and in part performance of his agreement, he put *his son* and daughter, the complainants, in possession of the unimproved part of lot No. 18, that *they* accepted the possession, and, with the consent of the father, erected thereon, with money belonging to the said Mary, and which was her separate estate, a dwelling-house, at the cost of $5000; that the said Mary consented to this application of the money belonging to her, cheerfully, because it was understood between herself and her husband that the said ground, with the house, was to be conveyed to her and her heirs, or in trust for her and their use; that, after the house was erected,

the complainants, Mary and Benjamin, took possession of it, with the knowledge and full approval of the father, who lived next door, and had been cognizant of the erection, and in part superintended it; and with his knowledge and approval, rented it to a Mrs. Degges; that the daughter-in-law received and applied the rents to her own uses; and that during the erection of said house, and after its completion, the father often avowed his intention to execute and deliver a deed of the lot and premises to his daughter-in-law, in accordance with his promise.

The bill further stated that in 1861, whilst the said husband and wife, complainants in the case, were temporarily absent from the city of Washington, the father, without their consent, took possession of the house, and had continued to occupy it ever since, against the wishes of the complainants; that even since taking possession of the house, in the manner mentioned, he, the father, had promised to execute a deed for the property to his daughter-in-law, but had, when applied to, refused to make such deed; and the bill charged that the dwelling-house and ground belonged in equity to said daughter-in-law, and that she was entitled to a conveyance thereof from the father, and to an account of the rents and profits thereof since he took possession of the same; and prayed that he might be accordingly ordered to convey to the complainant, Mary, and her heirs, or to some one in trust for her and their benefit, the said parcel of ground and premises, and to render an account of the rents during his occupancy.

The father in his answer admitted, that in 1858 he was possessed as owner of the lots, and that the complainant, Benjamin, was his son; but denied that he was desirous that his son should be married to the said Mary and settled in life, and promised to convey to the said Benjamin and Mary, or either of them, the lot, if such marriage should be consummated; or that in consideration of any such promise on his part such marriage did take place, or that in part performance of such promise he put the complainants in possession of such lot, or that confiding in such promise the

complainants did enter upon and take possession thereof and proceed to erect a dwelling-house thereon, as was alleged in the bill. He admitted that a dwelling-house worth about $5000 was erected by the complainant, Benjamin, on the ground; that he knew that the house was erected by the said Benjamin, who, after its completion, held the same until 1861; and he admitted that in July, 1861, during the absence of the complainants, he took possession of the house which had been abandoned by its tenant, and had since occupied it with his family.

The father denied further " that, after taking possession he promised, as alleged, to convey the ground, or that he so promised at any time," but *admitted* " that after the marriage of complainants, and in 1859, when the complainant, Benjamin, was about to receive certain moneys belonging to his wife from her guardian, he, the respondent, *knowing that the habits of the complainant, Benjamin, were intemperate, and wishing to secure to his said wife and children the said moneys, and satisfied that the same would be in jeopardy if paid over to complainant, Benjamin, and by him used in business,* consented, on the application of complainant, Benjamin, to give him lot No. 16 in said square, provided he would allow the respondent, or his wife's guardian, to build with the said moneys a dwelling-house thereon, and provided that the said moneys should not be paid into the hands of the complainant, Benjamin, but should, for the said purpose, be applied and disbursed by the respondent or by the said guardian; that the complainant, Benjamin, agreed to these terms, provided the said described part of lot 18, instead of lot 16, was given; and to this change that the respondent assented, subject to the terms and conditions aforesaid; that under this agreement the dwelling-house was begun, but that the said conditions were wholly violated by the complainant, Benjamin, who, without the knowledge or approbation of the respondent, received the said moneys from his wife's said guardian, and used the same in his own business, or otherwise, contrary to the agreement, disposed of same." That the erection of the house having progressed as far as the first story, his son in-

formed him that he, the son, would be disgraced and ruined if the work was stopped, and that he was without means to proceed further; that he, the father, then borrowed from one Mrs. Sears $2008, for which he gave his note, in which his son joined, and that the note was secured by a deed of trust upon said described portion of lot 18, that *this loan was paid over by him (the father) to the son, with the express agreement that it should be devoted to the erection of said dwelling-house,* and should not be otherwise disposed of; but that the agreement was violated, and the money used by the son in his business. That this debt was one of those due when the son failed in business, and *was paid by him, the father;* and the father averred that he never intended to give any part of lot 18, save upon the terms and conditions aforesaid, and that upon the violation thereof he considered himself absolved from his said promise, and more especially so, as his son *was largely beyond the value of the house indebted to him.*

The testimony, which was marked by some temper, was contradictory and conflicting; but the weight of it showed that the father did encourage the marriage of his son with Miss Hamilton, his now wife, one of the complainants. That he did promise to give the lot in question to *her,* as a bridal present, at the time and in furtherance of said marriage, it being understood that a dwelling-house was to be built on it with her money. And that with the father's consent, and upon the faith of the promise made by him, a house was erected on the lot with the wife's money. That the house was, after its erection, rented out by the complainants as their property, with the consent of the father, and that the rents thereof were received by them and applied to the use of the wife, with like consent, down to a certain time, when the tenants, becoming alarmed at the threatened invasion of the capital by the rebel army, abandoned the house, and when the possession of the father took place; his son and daughter-in-law being at the time in Maryland, from which State the latter originally came.

That the allegation of debt from the son to the father was not made out.

The father, however, set up and endeavored to show that a part of the money expended in the erection of the said dwelling-house was not the money of his daughter-in-law, but was, in reality, advanced by himself.

The evidence on this point showed that, the son having received from his wife's trustee enough to build the house, did not use it all in this way; but put about $2000 of it into his business; that early in 1861 he failed, and made an assignment of his entire stock and effects, amounting to about $23,000, to his father, the appellant, upon secret trusts. The father testified that he himself paid the $2008 borrowed from Mrs. Sears, from his own private funds; but the son testified, and in this he seemed to be supported by documentary and other evidence, that in making the assignment to his father, he made it subject to the prior payment of certain confidential debts, among which plainly was this one of $2008, for which the lot was mortgaged to Mrs. Sears; and that it was paid out of the proceeds of the stock and effects assigned.

The cause being at issue and set down for hearing, was heard in the first instance upon the original bill, answer, and testimony taken thereunder, by the Supreme Court of the District of Columbia, and after it had been heard, and the proceedings had been read and considered, the said court, of its own motion, and without assigning any reason for their action, " ordered that the complainants have leave to amend their bill filed in the cause *on payment of costs*, the amendment to be filed on or before the 15th of November, 1866."

The case was accordingly heard on an amended bill, which, instead of alleging that the father had promised to give the son or his wife the lot, alleged that he promised to give the lot to *the wife*, it being understood that she would allow her money to be expended in building upon it a dwelling-house for *herself and her heirs*. On the amended pleadings, and on substantially the original evidence, the case was heard again, and a decree made that the father should make a deed to a trustee of the house and lot, for the sole use and benefit of his son's wife, freed from liability for the

son's debts, or those of any other husband; and that he should account for the rents since the filing of the bill. From that decree the case was now here on appeal.

*Messrs. Davidge and P. Phillips, for the father, appellant in the case,* contended—

1. That after publication had passed, and the case had been set down for hearing, the bill could not be amended in any other respect than by making new parties. That here the original bill alleged that possession was given to *both* husband and wife, and accepted by *both*, and the house erected by the husband with moneys which had been reduced into possession by him; that the whole scheme of it was for the recovery of property in which a married woman might have an interest subject to the marital rights of her husband, whereas the amended bill set up a claim adverse to said marital rights; that this changed the framework of the bill, and made a new case.

2. That to take a case out of the statute of frauds upon the ground of part performance, it was indispensable, not only to show that there was *some* contract, but to show a contract, clear, definite, and unequivocal in all its terms; that here the terms, as set out in the original bill, were to give and convey, in consideration of the marriage of the complainants, to *both* of them, or *one* or the *other* of them, *one* or *part* of *one* of the lots whereof defendant was seized, to the end that with money then belonging or expected to belong to the oratrix, *they* might erect thereon a dwelling-house for their habitation and home. How could such a contract be specifically performed? Here were three distinct and inconsistent contracts averred in the bill, and each alleged to have been made in reference to real estate, but to what real estate was left wholly uncertain by the contract. If the contracts were to be regarded as in the alternative, which was not alleged, to which of the three parties belonged the election as to how it should be executed, and when was that election to be exercised?*

---

* See Cox *v.* Cox, 26 Pennsylvania State, 375.

That, independently of all other things, as a repayment of whatever money of the wife had passed into the lot, would make her whole, the case, if a case for anything, was one for damages, and not for specific performance.

*Messrs. Webb and Kennedy, contra.*

Mr. Justice DAVIS delivered the opinion of the court.

It would seem clear, from the manner in which the court below, of its own motion, and without assigning any reasons for this action, gave the complainants leave to amend their bill, that on the original hearing it was satisfied that the evidence made out a case for relief, but a case different from the one stated in the bill; and, that as the pleadings must correspond with the evidence, it was necessary either to dismiss the bill without prejudice, or to give the leave to amend. The court adopted the latter alternative, doubtless, with a view to save expense to the parties, and because such a course could not, by any possibility, work any harm to the defendant.

It is insisted that this proceeding was erroneous; that after a cause has been heard, the power of allowing amendments ceases, or if it exists at all, it cannot go so far as to authorize a plaintiff to change the framework of his bill, and make an entirely new case, although on the same subject-matter, as, it is contended, was done in this instance under the leave to amend.

This doctrine would deny to a court of equity the power to grant amendments after the cause was heard and before decree was passed, no matter how manifest it was that the purposes of substantial justice required it, and would, if sanctioned, frequently embarrass the court in its efforts to adjust the proper mode and measure of relief. To accomplish the object for which a court of equity was created, it has the power to adapt its proceedings to the exigency of each particular case, but this power would very often be ineffectual for the purpose, unless it also possessed the additional power, after a cause was heard and a case for relief

made out, but not the case disclosed by the bill, to allow an alteration of the pleadings on terms, that the party not in fault would have no reasonable ground to object to. That the court has this power and can, upon hearing the cause, if unable to do complete justice by reason of defective pleadings, permit amendments, both of bills and answers, is sustained by the authorities.[*]

Necessarily, in a Federal tribunal the matter of amendment at this stage of the progress of a cause rests in the sound discretion of the court. At an earlier stage, this discretion is controlled by the rules of equity practice adopted by this court, but not so upon the hearing, for there is no rule on the subject of amendments applicable to a cause which has advanced to this point. As, therefore, the leave to amend in this instance was within the discretion of the court, we will proceed to dispose of the case on its merits.

It is unnecessary, in the view we have taken of the power of the court over amendments at the hearing, to discuss the question whether the amended bill is materially different from the original bill. It is enough to know, if different, that the subject-matter of both bills is the same, and that the contract, consideration, promise, and acts of part performance, stated in the amended bill, are stated with sufficient precision, and, if supported by proof, entitle the complainants to the relief which they seek at the hands of a court of equity. The statute of frauds requires a contract concerning real estate to be in writing, but courts of equity, whether wisely or not it is too late now to inquire, have stepped in and relaxed the rigidity of this rule, and hold that a part performance removes the bar of the statute, on the ground that it is a fraud for the vendor to insist on the absence of a written instrument, when he had permitted the contract to be partly executed. And equity protects a parol gift of land, equally with a parol agreement to sell it, if accompanied by possession, and the donee, induced by

[*] Mitford's Chancery Pleading, 326, 331; Story's Equity Pleading, §§ 904 and 905; Daniel's Chancery Practice and Pleading, 463, 466; Smith *v.* Babcock, 3 Sumner, 583; McArtee *v.* Engart, 13 Illinois, 242.

the promise to give it, has made valuable improvements on the property. And this is particularly true, where the donor stipulates that the expenditure shall be made, and by doing this makes it the consideration or condition of the gift.*

Was this gift in question made to Mary H. Neale and her children, and has the condition on which it was given been performed so as to make it inequitable for the donor to escape from his engagement? We do not propose to discuss the evidence at length, in order to vindicate the conclusion we have reached in regard to it. It is in many respects conflicting and contradictory, and it is to be regretted that the contest over this property, like all contests between near relations, has elements of bitterness in it. It is enough to say, for the purposes of this suit, that on the whole evidence it is reasonably certain that John E. Neale agreed to give to Mary Hamilton, who was about to marry his son, in furtherance of the marriage, the lot in controversy, for the benefit of herself and children, and for a home for the family, if, with her means, a suitable dwelling-house was erected on it, and that *this* has been done. On no other theory of this case are the undisputed facts reconcilable with the conduct of the parties. There is no dispute that the husband, before and after marriage, was of dissipated habits; that the father knew it, and had but little confidence in his ability to manage money with judgment, and was desirous that the property of the wife should not be embarked in the husband's business. What so natural as that a father, having a son of this character about to marry a lady of property, should wish to have her property secured against the consequences of her husband's improvidence and dissipation. This could not be done, as he had a lot to give on the occurrence of the marriage, by agreeing to give it to the son if he improved it with his wife's means, because he might sell it and waste the money, or become involved in debt and lose it in that way. Indeed, we are assured from the father's own estimate of his

---

* 1 Leading Cases in Equity, American note to Lester *v.* Foxcroft, 625.

son's character, he feared the happening of one or the other of these events in case he donated the lot to the son, and, to avoid placing his own gift and the wife's inheritance in equal peril, he did what any other parent under like circumstances would have done, gave the lot to the wife, so that, if improved by her, it would be safe at all times from the effects of the husband's folly, and be a secure home for the family. It is true, the declarations of the father on the subject, are, literally taken, contradictory, but we place but little reliance as evidence on his statements made to some witnesses, that the gift was to the son, because they are in conflict with statements frequently made at different times to other persons, that the gift was to the wife, and are inconsistent with his conduct and motives fairly deducible from the other evidence in the case. Besides, in one sense, it is true the gift was to the son, as it was for his benefit, and would not have been made if he had remained single, and in this sense the father doubtless meant his declarations on the subject to be received.

As, therefore, the gift was to the wife, and in fee simple, for a less estate would not secure the object the father had in view, it remains to be seen what was done with the property after the intermarriage of the parties. And here the character of the evidence, and its effect on the issue we are considering, cannot be misapprehended. It appears that shortly after the marriage the house was built with money belonging to the wife, and with the knowledge of the appellant, who lived on an adjoining lot and acted, according to one witness, as general supervisor in the matter. It further appears that on the completion of the house the newly married couple lived in it, for a season, and afterwards rented it, and that during their absence on a casual visit to Maryland in 1861, it having become temporarily vacant by the withdrawal of the tenant, the appellant, without their knowledge and consent, moved into it and still retains possession of it. It is impossible, in view of these facts, which prove that the condition of the gift had been performed, to escape the conclusion that the father at the outset was satisfied with the arrangement,

and that his subsequent conduct, tending to show that he had disavowed it, was an afterthought.

It is insisted that a part of the money used in building the house was advanced by the father, who, in conjunction with the son, borrowed it from Mrs. Sears, and that, therefore, the consideration, *pro tanto*, for the gift has failed. It is clear that the husband received from the wife's guardian more money than was required to build the house, and had agreed with her to devote enough of it to this purpose, but, instead of doing this, unfortunately, he employed a portion of it in his store, which rendered necessary the Sears loan. This loan, secured by the father on the property in controversy, stood on the books of the son as a confidential debt due his wife, and when he failed and assigned his property, he recognized it as such and preferred it over all other debts. There was certainly nothing wrong in this provision, which relieved the property of the wife of an incumbrance created because the husband had misappropriated her money, and, as the father accepted the trust under the assignment, with this debt thus preferred, and at the same time received sufficient property to pay it, it is hard to see wherein he has cause of complaint in this matter, or how he can truthfully say he paid any part of the money that went into the house. In any proper sense the house was built with the wife's money, and equity will give her the benefit of it in this controversy with the father.

As before remarked, the case as stated is made out with reasonable certainty, which is all that is required.* Any other degree of certainty in a case of this character is unattainable.

Damages will not compensate for the breach of this contract, nor answer the intention of the parties to it, and a specific performance is therefore essential to the complete ends of justice.

Decree affirmed.

---

* 1 Leading Cases in Equity, American note to Lester *v.* Foxcroft, *supra*; Mundy *v.* Jolliffe, 5 Mylne & Craig, p. 177.