12277

SMITH v. WILLIAMS *ET AL.*

(139 S. E., 625)

1. Trust.—Unsigned Memorandum Declaring Land to Belong to Writer's Wife Held Ineffective as Declaration of Trust (Civ. Code, 1922, § 5453).—An unsigned memorandum declaring that certain property to which writer held legal title was the separate property of his wife *held* ineffective as a declaration of trust or to enlarge effect of deed conveying life ·estate in such land and re-

# 266          SMITH *v.* WILLIAMS *et al.*

serving remainder to himself and wife; Civ. Code, 1922, § 5453, requiring declarations of trust to be in writing and signed.

2. DEEDS—HUSBAND'S DEED OF LIFE ESTATE WITH REMAINDER TO HIMSELF AND WIFE HELD NOT TO GIVE WIFE FEE-SIMPLE TITLE AFTER DEATH OF LIFE TENANTS AND HUSBAND.—Where husband holding legal title to property belonging to his wife conveyed life interest therein to his wife's parents by deed reserving remainder to himself and wife, and where deed lacked essential elements necessary to create an estate by survivorship between husband and wife in the remainder, *held* wife after death of life tenants and her husband did not take a fee-simple title to exclusion of her children.

3. EVIDENCE—HUSBAND'S DEED AND UNSIGNED MEMORANDUM, INEFFECTIVE AS DECLARATION OF TRUST, HELD COMPETENT ON ISSUE WHETHER FAMILY AGREEMENT HAD BEEN MADE FOR USE OF LAND BY WIDOW.—Husband's deed conveying life estate in land to wife's parents and reserving remainder to grantor and wife and an unsigned memorandum in which husband declared that the property so conveyed was his wife's separate property *held* relevant on issue whether family agreement had been made following husband's death entitling widow to retain use and possession of land for life.

4. FRAUDS, STATUTES OF—FAMILY AGREEMENTS EFFECTING DISPOSAL OF ESTATES ARE FAVORED AND NEED NOT BE IN WRITING.—Family agreements effecting disposal of estates are favored by the Courts and need not be in writing if acted upon and acquiesced in.

5. ESTOPPEL—"EQUITABLE ESTOPPEL" ARISES FROM CONDUCT AND PREVENTS ASSERTION OF TECHNICAL RIGHTS CONTRARY TO EQUITY AND GOOD CONSCIENCE.—"Equitable estoppel" arises from conduct, including spoken or written words, positive acts, silence, or omission, and prevents a party from asserting technical rights when contrary to equity and good conscience.

6. FRAUDS, STATUTE OF—EVIDENCE HELD TO SHOW WIDOW'S PART PERFORMANCE OF ORAL FAMILY AGREEMENT FOR USE OF LAND COMPRISING HUSBAND'S ESTATE.—Evidence *held* to show acts of widow, in pursuance of oral family agreement for her use of land comprising part of husband's estate, done with the knowledge and consent of plaintiff, sufficient to estop subsequent assertion of technical rights.

7. INFANTS—FAMILY AGREEMENT FOR WIDOW'S USE OF LAND HELD NOT VOID BY REASON OF INFANCY OF PLAINTIFF, NOR VOIDABLE BY HIM 14 YEARS AFTER ATTAINING HIS MAJORITY.—Family agreement for widow's use during life and improvement of land comprising part of estate of her husband *held* not void by reason of minority of plaintiff entitled to interest in such property, nor was it voidable by him 14 years after attaining his majority.

8. INFANTS—INFANT'S AGREEMENT FOR USE OF LAND IS VOIDABLE ONLY.—Infant's agreement for use of land by his mother is voidable but not void.

9. INFANTS—VOIDABLE CONTRACT MUST BE DISAFFIRMED WITHIN REASONABLE TIME AFTER ATTAINING MAJORITY, AND ASSENT TO BE BOUND BY VOIDABLE CONTRACT MAY BE EXPRESS OR IMPLIED AFTER MAJORITY. —Disaffirmance of an infant's voidable contract must be made within a reasonable time after the disability ceases, and assent to agreement may be signified either by express recognition or acts implying recognition after attainment of majority.

10. INFANTS—ACQUIESCENCE AFTER ATTAINING MAJORITY MAY BE REGARDED AS CONFIRMATION OF CONTRACT THERETOFORE VOIDABLE.—Acquiescence of infant after attaining his majority may be relied upon as an implied affirmance of a hitherto voidable contract.

11. INFANTS—AGREEMENT FOR WIDOW'S USE OF LAND HELD NOT VOID BECAUSE OF INFANCY OF PARTIES NOT COMPLAINING.—Plaintiff attacking validity of family agreement for use by widow of land comprising part of husband's estate cannot rely on infancy of other parties to the agreement who have not advanced such claim.

Before BONHAM, J., Spartanburg, April, 1925. Affirmed.

Action by J. B. Smith against M. J. Williams and others. Judgment for defendants, and plaintiff appeals.

The following is the decree of the trial Judge:

"This is an action for the partition of a tract of land situated in Spartanburg county, alleged in the complaint to contain about 124 acres. It came before me for hearing at the March, 1925, term of the Court of Common Pleas for Spartanburg County, on exceptions to the report of the master, to whom it had been referred to hear and determine all the issues of law and fact. He found in favor of the plaintiff's right to partition, took an accounting of the rents and profits, stated the accounts between the parties, and passed upon the question of improvements claimed by the defendant, Mrs. Williams. The history of the events which culminated in this action is clearly stated by the master, about as follows:

NOTE: On statutory requirement that declaration and creation of trust be manifest and proved by writing, see 26 R. C. L., 1198; 5 R. C. L. Supp., 1444.

As to ratification of infant's contract by unreasonable delay in avoiding, see 14 R. C. L., 253; 3 R. C. L. Supp., 202.

Equitable estoppel, when arises, see 10 R. C. L., 689; 2 R. C. L. Supp., 1039; 4 R. C. L. Supp., 672; 5 R. C. L. Supp., 563; 6 R. C. L. Supp., 617.

"Hugh Smith died August 5, 1900, and his widow, now Mrs. M. J. Williams, formerly Mrs. M. J. Smith, qualified as his administratrix. At the time of his death Hugh Smith was seized and possessed of a tract of land containing about 72 acres, which is a part o fthe tract of 124 acres described in the complaint. About 11 years before his death Hugh Smith had made a deed to the remaining 52 acres comprising the tract in litigation by which he conveyed the said 52 acres to J. B. Moore. Were it not for a proviso following the description of the land in this deed, there would be no doubt that it conveyed nothing more than a life estate to J. B. Moore alone, with the entire reversion remaining in Hugh Smith. By the proviso, however, the grantor, Hugh Smith, stipulated, 'That after the death of James B. Moore and Mrs. M. A. Moore then the right, title and interest in the above lands to belong to me and my wife, M. J. Smith, and in the event J. B. Moore and wife should wish to sell, then the value in this place to be invested in another farm with provision that at their death the property shall belong to me and my wife (M. J. Smith) and that I shall have the refusal of the fifty-two acres if it should be sold.'

"At his death Hugh Smith left surviving him as his sole heirs at law, his widow, Mrs. M. J. Smith, and four children, Mamie Haddon, Newton Smith, Van Buren Smith, and Pearle Smith. Pearle Smith died intestate about 1905, leaving as her heirs at law her husband, C. L. Wood, and two children, Annie Wood Lawton and Clyde L. Wood.

"So far I have followed the narrative of the Master.

"The defendant, Mrs. M. J. Williams, by her answer, alleges that soon after the death of her husband, Hugh Smith, she called together her children and exhibited to them a paper which she said was written and signed by her husband in his last illness, expressing the desire that his property be kept together during the lifetime of his wife; that she and her children entered into a family agreement by which she bound herself to pay the debts of the estate, and

the children agreed that she should have the use of the property for her lifetime; that she has faithfully carried out her part of the family agreement, has largely increased the value of the property, and has made valuable improvements on it. She further claims that she is the owner of the 52-acre tract.

"The complaint and this answer make the real issues. The cardinal questions are: What interest has Mrs. Williams in the 52 acres? And was there a family agreement? Is it valid and binding?

"The master held, in regard to the Williams interest in the 52-acre tract as follows: 'Moore being dead and his estate terminated, I think the effect of the proviso is the same as if Hugh Smith had originally made a deed "to me and my wife, M. J. Smith." Without words of limitation, such a deed could not have conveyed to M. J. Smith more than a life estate, and without words of survivorship could not have extended to more than one-half the land. I, therefore, find that M. J. Williams, in addition to her estate of inheritance, has a life estate in an undivided one-half of the 52 acres described in the deed, the reversionary interest in that half; and the fee in the other half remained in Hugh Smith.'

"I cannot concur in this finding of the Master. The fee in the whole 52 acres never left Hugh Smith. He never divested himself of it. When the Moores died and their life estate ended, then ensued the life estate provided for Mrs. Smith. The Master concedes that she took a life estate but limits it to one-half. I think he is in error. Hugh Smith could not take a life estate in any part of it because he held the fee to the whole. It may be that the grantor intended to give his wife a half interest in fee in the property. It is probable that he intended that the land should revert to him and his wife in fee simple in equal parts. But the deed was inexpertly drawn and fails of its purpose. The estate on the death of the Moores reverted to Hugh Smith and his wife; he had the fee and she the life estate; at her

death it reverts to his estate, he being dead. 'A reversion, or estate in reversion, is an estate, the owner of which, without disposing of the estate itself, has deprived himself of the right of personal possession by creating of this estate in favor of another. The fee simple remains the same after the creation as before, but is without the right of immediate possession because of the transfer of the lesser estate. The possession will, however, revert upon the termination of the lesser estate, and for this reason the fee is said to be an estate in reversion.' 1 Tiffany on Real Property, 467. 'At common law whenever a greater estate and a lesser coincide and meet in one and the same person, without any intermediate estate, the lesser is immediately annihilated, or, in the law phrase, it is said to be merged; that is, sunk or drowned in the greater." 1 Tiffany on Real Property, 89; 2 Blackstone, 177; *McCreary v. Coggeshall,* 74 S. C., 42; 53 S. E., 978; 7 L. R. A. (N. S.), 433; 7 Ann. Cas., 693.

"So here, the life estate could not, in whole or in part, be vested in Hugh Smith, the owner of the fee. It must, therefore, upon the falling in of estate of the survivor of the Moores, have vested in Mrs. M. J. Smith, in the whole tract, and, as she has survived her husband, the grantor, the reversion is to his estate at her death.

"It is advanced that if it be held that Mrs. Williams has a life estate in the whole 52-acre tract, nevertheless partition may be made under the provisions of Section 5292, Code 1922, Vol. 3. The position would be tenable if there were one or more persons jointly interested with Mrs. Williams in the life estate. But there are none. She cannot by this process be deprived of the enjoyment of her life estate. *Cannon v. Lomax,* 29 S. Ct., 369; 7 S. E., 529; 1 L. R. A., 637; 13 Am. St. Rep., 739.

"Is plaintiff entitled to partition of the other tract, the 72-acre tract of which Hugh Smith died seized and possessed? This depends upon the answer to the questions:

Was there a 'family agreement' between Mrs. Smith (now Mrs. Williams) and her children, by the terms of which she was to pay the debts of Hugh Smith's estate and remain in possession thereof till her death? If there was such an arrangement, was it valid? Was such an agreement made? There is in evidence a paper purporting to have been written by Hugh Smith in his last illness in which he expressed the wish that his wife have the property for her lifetime. The Master admitted it in evidence 'for what it is worth.' It has no testamentary character, nor such force and effect, but it has potential bearing in the solution of the question, was there a family agreement? The Master excluded the testimony of Mrs. Williams and Newton Smith on this subject. I think it was admissible. Certainly that of Newton Smith was against his interest. From all the evidence it is certain that soon after her husband's death, Mrs. Smith and her children had a conference; she and Newton testify that she then exhibited the paper written by Hugh Smith; that it was agreed that she pay the debts and keep the property for her lifetime. Their testimony is clear and positive. That of Mamie Haddon and the plaintiff is vacillating, contradictory, and wholly unsatisfactory. Mrs. Lawton, the daughter of Pearle Wood, now deceased, by her answer admits the agreement and desires that it be upheld. It would be clearly to her interest to have the estate partitioned now, but she prefers that the agreement with her grandmother, which her mother made, be kept inviolate. It is needless to analyze the evidence; a calm perusal of it must satisfy one that such an agreement was made. Was it a valid agreement? It is urged against it that it is obnoxious to the Statute of Frauds. I cannot discover any section of that statute which it violates. But if it were obnoxious to the statute the defect has been cured by the full and faithful performance of her part of the agreement by Mrs. Williams.

"It is urged further that the agreement is invalid because three of the children were minors and are not bound by their

contract. It is true that the plaintiff and Newton and Pearle
Wood were minors when the contract was made, though
Pearle was married. She ·attained her majority before her
death and never repudiated the arrangement. Her daugh-
ter, Mrs. Lawton, who is *sui juris,* stands for its· support;
Newton openly supports; Mamie Haddon has supported it,
though she now backs the plaintiff in his effort to repudiate.
Her testimony is most unsatisfactory and does her little
credit; she shuffles ·and dodges all the way. And, lastly,
the testimony of the plaintiff is a mass of contradictions,
prevarications, and evasions and worthy of little or no cre-
dence. He was once the champion of his mother's right to
remain in possession of the property, even to the extent of
threatening to kill his brother-in-law if the latter dared
carry out his purpose to bring an action for partition of the
land. The Master, although he finds against the validity
of the family agreement, has this to say: 'Apparently no
claim was ever made against her by any of the cotenants
for a division of the rents, and no effort to partition the
estate of Hugh Smith· was undertaken until the commence-
ment of this action, 22 years after his death.' To my mind
this is the strongest possible proof that there was a family
agreement, acquiesced in and ratified by all the children.

"Family agreements are favored in equity. In *Smith v.*
*Tanner,* 32 S. C., 259; 10 S. E., 1008, Chief Justice Simp-
son said, 'Courts of Equity have uniformly upheld and sus-
tained family arrangements in reference to property, where
no fraud, imposition, or overreaching appears, with a
"strong hand." As is said in the text-writers: "In family
arrangements, an equity is administered in equity which is.
not applied to agreements generally" [citing authorities]. ·
And such arrangements will be held binding when, in cases
between strangers, the like agreements would not be en-
forced. It is needless to go into the reason of this doctrine.
It is sufficient to say that it is well established, and has often
been applied, both in England and America.' Affirmed in

*Smith v. Oglesby,* 33 S. C., 194; 11 S. E., 687, and the principle recognized in *Weathersbee v. Weathersbee,* 82 S. C., 4; 62 S. E., 838.

"Mrs. Williams, then Mrs. Smith, took a poor and impoverished place at the death of her husband, paid the debts of the estate, peddling about the country to eke out the income from the place. She has paid the debts, improved the land by wise tillage, and has put on the place improvements of a permanent nature to the value of $4,000.00. She has lived faithfully up to her part of the agreement. She is old and in poor health. The Court of Equity will not permit her, in these circumstances, to be cast out of the home she has saved and made valuable at the instance of her ungrateful son. His conduct calls to mind the words of King Lear: 'How sharper than a serpent's tooth it is to have a thankless child.'

"In the view which I take of this case, it is not necessary to consider *seriatim* the exceptions to the Master's report. The action is prematurely brought and cannot be maintained until after the death of Mrs. Williams; it follows that the accounting made by the Master is premature.

"It is, therefore, ordered, adjudged, and decreed that the report of the Master is overruled and set aside.

"Ordered, further, that the complaint be dismissed."

*Messrs. Bomar & Osborne,* for appellants, cite: *Cases distinguished:* 32 S. C., 259; 33 S. C., 194; 82 S. C., 4.

*Messrs. Carlisle & Carlisle* and *Brown & Boyd,* also for appellant.

*Messrs. Nicholls, Wyche & Byrnes, Stanyarne Wilson* and *Lyles, Daniel & Drummond,* for respondents.

September 23, 1927.

The opinion of the Court was delivered by MR. ACTING ASSOCIATE JUSTICE R. E. WHITING.

This action was brought by plaintiff in 1922 for the partition of estate lands of his father, Hugh Smith, who died

intestate August 5, 1900. The property involved in the proceeding consists of 124 3/10 acres, more or less, of farm property in Spartanburg County, comprising two contiguous tracts, one of about 72 acres known as the home place and the other of 52 acres known as the Moore place. The complaint further alleges that since the death of Hugh Smith, the defendant, Mrs. M. J. Williams (the widow of Hugh Smith and the mother of plaintiff), has been in possession of the estate property and that she should account to her cotenants for rents and profits received. The defense to the action, as set up in the answer of Mrs. Williams, is that a family settlement or agreement had been entered into and had been fully carried out by her through paying debts of the estate and making valuable improvements on the property, whereby she has become entitled to the possession and use of the property during her lifetime. Estoppel because of the agreement and expenditures made in pursuance thereof, as well as the ownership by Mrs. Williams in her own right of the 52-acre tract known as the Moore place, is also alleged in the answer.

There were four children who survived Hugh Smith: Mamie Haddon, then 21; Newton Smith, 18 or 19; Pearle Wood, 17; and the plaintiff, J. B. Smith, 13. The mother's marriage to her second husband, Williams, took place in 1906. At about the same time Pearle Wood died, being survived by her husband, C. L. Wood, and two children, the defendants, Annie Wood Lawton and Clyde Wood. The family divides in the present controversy. Newton Smith, in an answer in which the defendant, Annie Wood Lawton, also joins, supports his mother's contention that there was a family agreement entitling her to the occupation and use of the entire estate property for her lifetime. He also states in testimony that plaintiff and the other children had discussed and admitted the agreement after they became of age. Of the other parties to the action, C. L. Wood is in default; Clyde Wood, as a minor, has formally

answered by his guardian *ad litem;* and Mamie Haddon has joined, by both answer and testimony, with the plaintiff in the contention that no family agreement in respect to the property had ever been entered into. For the purpose of convenience, we shall refer to the plaintiff, J. B. Smith, as the appellant and to the defendant, Mrs. M. J. Williams, as the respondent.

Other material facts of the family history, and also an analysis and characterization of the conflicting evidence given in the cause, are set out in the decree of his Honor, Judge M. L. Bonham, which reverses the Master's report, sustains the claim of the respondent to possession of the property under the family arrangement, and dismisses the action as having been prematurely brought. The decree will be incorporated in the report of the case. The testimony concerning the family conference, the agreement between the children and their mother in respect to the property, and their subsequent acts and conduct in relation to such agreement, appears to have been carefully weighed and considered by the Circuit Judge; and we are satisfied to adopt the conclusions of fact that he has announced. In addition to his finding that a family conference had been held by the mother and her children and that a family agreement concerning the property was entered into, acquiesced in, and ratified by all the children, the resultant conditions which give living substance to the agreement are stated by Judge Bonham in the following graphic commentary:

"Mrs. Williams, then Mrs. Smith, took a poor and impoverished place at the death of her husband, paid the debts of the estate, peddling about the country to eke out the income from the place. She has paid the debts, improved the land by wise tillage, and has put on the place improvements of a permanent nature to the value of $4,000.00. She has lived faithfully up to her part of the agreement. She is old and in poor health. The Court of Equity will not permit her, in these circumstances, to be cast out of the

home she has saved and made valuable at the instance of her ungrateful son. His conduct calls to mind the words of King Lear: 'How sharper than a serpent's tooth it is to have a thankless child.' "

The appeal from the decree of the Circuit Judge is based mainly on legal positions under exceptions which present two primary questions: First, the construction that under proviso contained in a deed made by Hugh Smith to James B. Moore and wife, a life estate, taking effect upon the expiration of the precedent life estates granted to the said James B. Moore and wife, had been given the respondent, as the wife of Hugh Smith, in the 52-acre tract designated above as the Moore place; and, second, that there was no competent evidence (meeting the formalities necessary to create a free hold estate) to show the family agreement made after the death of Hugh Smith among his heirs to the effect that his widow should pay all the debts of his estate and retain full possession and employment of the estate during her lifetime. The real issue of the appeal arises under the second question. Subsidiary matters involved thereunder will be separately considered as they arise.

1. We may say before passing to the second question that the language of the Moore deed was quite evidently intended to create a tenancy by entirety between Hugh Smith and his wife, so that the whole estate should remain to the survivor. About 11 years before his death he made a deed, in consideration of $600.00 stated as having been paid to him by James B. Moore, granting to the said James B. Moore and his wife life estates in the 52-acre tract therein described, with the provision that, after the expiration of such life estates, "then the right, title and interest in the above lands to belong to me and my wife, M. J. Smith." Receipts showing payment for the 52 acres were offered in evidence. Mrs. Smith was the only child of Mrs. Moore. In her testimony the following explanation of the transaction appears:

"Mr. Smith bought the whole 124 acres and then sold 52 to mother and stepfather, and they paid him in full for that, and it was the understanding that after their death it was to come to me."

This testimony as to the intent of the deed has the ·corroboration of an unsigned pencil-written memorandum, identified as being in the handwriting of Hugh Smith, in which the following instructions were given:

"I want all my personal property to stand after my death as it is until my wife's death. The Moore land is her own property. My own tract of land is to be divided at her death. I have nothing to do with the Moore land that came by her mother, Mrs. Moore."

But the difficulty here encountered is that the unsigned memorandum cannot be given any legal effect, either to enlarge the conveyance of the deed or to constitute a declaration of trust, as under the statutes (Civil Code 1922, §§ 5453, 5454) all declarations or creations of trust must be in writing which must be signed by the parties so making or creating the same, except only where arising or resulting from implication of law. And, moreover, the deed in which Hugh Smith originally undertook to make provision for his wife fails of its intended purpose because it was inexpertly drawn. There is, besides, the question whether an estate by entirety can be created at all under the separate estate acts. *Green v. Cannady,* 77 S. C., 193, 201; 57 S. E., 832, 835. "At least," as was said in the *Cannady* opinion, "the separate estate acts should be given the effect to make her [the wife] tenant in common with her husband in a grant to both, in the absence of any expressed intention in the deed to convey the whole to the survivor." The grantor undertook to make joint provision for himself and his wife.. Since the deed fails of the necessary elements to create an estate by survivorship between them, we do not think that the language employed can now be so construed as to submerge the grantor's reservation of interest for himself and

thus to give his wife an exclusive life estate in the entire property. There is still another defect in the deed that makes its construction questionable. It does not contain apt words of conveyance from Hugh Smith to his wife, to make the deed operative between them as giving her any estate or interest in the property. *Dantzler v. Riley,* 109 S. C., 44, 47; 95 S. E., 132. *Thompson on Real Property,* §§ 3060–3063; *McGarrigle v. Roman Catholic Orphan Asylum,* 145 Cal., 694; 79 P., 447; 1 L. R. A. (N. S.), 315; 104 Am. St. Rep., 84. The decision of the Court below was against the contention that the wife should take an estate in fee in the 52-acre tract. The correctness of this position is not now questioned. What lesser estate, if any, was created by the deed in favor of the grantor's wife need not be further considered, as the conclusions we have reached on the second question, in sustaining the settlement agreement that gives her the use of this tract as well as the home tract of 72 acres, are determinative of the whole subject-matter of the appeal.

2. From the standpoint of consideration of the second question the stipulation in the Moore deed and also the memorandum left by Hugh Smith are both relevant as showing the situation of the parties and the conditions under which the family conference between mother and children was called following the father's death. The father had undertaken to make a declaration of trust that the Moore place, to which he held the legal title, actually belonged to his wife and had come to her from her mother. It is not denied that it was in his handwriting. There lacked only his signature to give it legal effect as a trust declaration in respect to the 52-acre tract. He had also expressed his wishes in reference to the remainder of the property that the home tract was to be divided at his wife's death. This was not, in legal effect, such a charge upon the inheritance of his children that it would have been enforceable against them in a judicial proceeding; but, in moral right, the re-

quest, if recognized as expressing their father's wishes, was just as much a charge upon them, which filial duty should cause them to comply with, as if the paper containing the request had fully met the formalities of execution prescribed by law.  The same principle governs here as in the case of *Miley v. Deer,* 93 S. C., 66; 76 S. E., 27, where it was said by Mr. Justice Woods:

"It is true the paper purporting to be a will had only two witnesses, but the plaintiffs agreed that it should be taken and acted upon, and the estate settled, as if it had been executed according to law."

So in the present case, the request of Hugh Smith, when shown and discussed at the family conference, ripened into the fruit of his desire through its acceptance by his children and wife as the basis of a family arrangement that has served to maintain a home for the children during their minority, and that has also materially enhanced the value of the estate property by the payment of debts, the preservation of the estate against sale in aid of assets, and the placing of substantial improvements thereon.

3. The able and skillfully prepared argument of appellant's attorneys presents very forcefully the contention that the family agreement was not attended by any of the formalities of execution necessary to create a freehold estate, and, further, that the plaintiff and two of the other children were minors at the time of the alleged agreement.  While conceding that family agreements are favored by the Courts, it is nevertheless contended that they should be supported by competent evidence and that in each of the three cases cited as authority in the decree of the Circuit Judge, *Smith v. Tanner,* 32 S. C., 259; 10 S. E., 1008.  *Smith v. Oglesby,* 33 S. C., 194; 11 S. E., 687, and *Weathersbee v. Weathersbee,* 82 S. C., 4; 62 S. E., 838, a real agreement in writing had been entered into and signed by the parties in interest.

To the authorities cited by the Circuit Judge as upholding and sustaining family arrangements in respect to property we may add, as leading to the same conclusion, the cases of *Murrel v. Murrel,* 2 Strob. Eq., 148; 49 Am. Dec., 664. *Bossard v. White,* 9 Rich. Eq., 483; *Gardner v. Gardner,* 49 S. C., 62; 26 S. E., 1001. *Miley v. Deer,* 93 S. C., 66; 76 S. E., 27, and *Huggins v. Price,* 96 S. C., 83, 85; 79 S. E., 798. *Parrott v. Barrett,* 70 S. C., 195; 49 S. E., 563. *Mitchell v. Mitchell,* 129 S. C., 321; 123 S. E., 854. The case of *Gardner v. Gardner* is of especial importance in the present consideration, as there, likewise, the agreement was not attended by any formalities, the testimony was conflicting, and it was contended that the alleged family settlement had not been proven by evidence of the character required. The Referee, in holding that the evidence was not sufficient to warrant him in finding that there was a family settlement, commented on the informality of the understanding in the words:

"Now, surely, if such a contract or family settlement was made, * * * Mr. Crawford would have reduced it to writing. * * * Would not the other members of the family have insisted upon having the agreement put in writing?"

This report was confirmed by the Circuit Judge. The judgment of the Circuit Court was, nevertheless, reversed on appeal; the opinion written by Chief Justice McIver, pointing out that while there was a conflict of testimony as to what had occurred at the meeting, it was more reasonable to adopt the version of Mr. Crawford than that of the other witnesses, and that the subsequent conduct of the parties also reflected light upon and confirmed the view that there was a family arrangement. Similarly, in *Huggins v. Price* and *Miley v. Deer,* family arrangements in respect to property were sustained without any agreement in writing between the parties in question, although the arrangements had their inception in improperly executed pa-

pers that could not of themselves be given the force and effect of legal conveyances.

The conclusions of the foregoing cases seem clearly explainable under general principles of equity jurisprudence, without the necessity of regarding family arrangements as anomalies of the law. Suppose we apply the same standards that are used in passing upon like agreements between strangers. It will be found that, when not attended by formalities of execution, the arrangement had been acted upon or long acquiesced in by the interested parties. The agreement, although perhaps unenforceable when made, thus became entitled to be given full force and effect under the doctrine of equitable estoppel, which is stated in *Pomeroy's Equity Jurisprudence* (4th Ed.), § 802 (Volume 2, p. 1635), as follows:

"Equitable estoppel in the modern sense arises from the conduct of a party, using that word in its broadest meaning, as including his spoken or written words, his positive acts, and his silence or negative omission to do anything. Its foundation is justice and good conscience, * * * and its practical effect is, from motives of equity and fair dealing, to create and vest opposing rights in the party who obtains the benefit of the estoppel."

In the footnote to the quoted section of *Pomeroy* (Volume 2, pp. 1636–1639), the author makes particular reference to the admirable and accurate presentation of the equitable conception of estoppel from conduct (as a rule of property, contract, or remedy, rather than a mere rule of evidence), as given in the famous opinion of Chief Justice Perley in *Horn v. Cole,* 51 N. H., 287, 289 (12 Am. Rep., 111), where it is said:

"Equitable estoppels are admitted on the * * * ground of promoting the equity and justice of the individual case *by preventing a party from asserting his rights under a general technical rule of law,* when he has so conducted himself that it would be contrary to equity and good conscience for

him to allege and prove the truth. * * * As in other cases of fraud and dishonesty, the circumstances out of which the question may arise are of infinite variety; * * * and in equity, the doctrine has been liberally applied *to suppress fraud and enforce honesty and fair dealing,* without any attempt to confine the doctrine within the limits of a strict definition." (Italics ours.)

Estoppel by conduct is recognized and given application in numerous South Carolina decisions: *Lessee of Tarrant v. Tarrant,* 1 Bay, 239, 241; *Marines v. Goblet,* 31 S.C., 153; 9 S. E., 803; 17 Am. St. Rep., 22. *Latimer v. Marchbanks,* 57 S. C., 267, 279; 35 S. E., 481. *Pollock v. Pegues,* 72 S. C., 47; 51 S. E., 514. *Scarborough v. Woodley,* 81 S. C., 329, 331; 62 S. E., 405. *Sullivan v. Moore,* 84 S. C., 426; 65 S. E., 108; 66 S. E., 561. *McMillan v. Hughes,* 88 S. C., 296; 70 S. E., 804. *Boyce v. Mosely,* 102 S. C., 361; 86 S. E., 771. *Anderson v. Dunbar,* 105 S. C., 416; 90 S. E., 31. Thus in *Cannon v. Baker,* 97 S. C., 116; 81 S. E., 478, it was said in an opinion by Mr. Justice Fraser: "Estoppel from conduct is exquisite justice." In *Chambers v. Bookman,* 67 S. C., 432; 46 S. E., 39, Mr. Justice, later Chief Justice, Gary quoted with approval: "If one remains silent where in conscience he ought to speak, equity will debar him from speaking when in conscience he ought to remain silent." And in *Railway Co. v. Victor Mfg. Co.,* 93 S. C., 397, 404; 76 S. E., 1091, 1094, it was said: "The character of the buildings forbids any other conclusion than that the railroad company must have known that the owners were building them under a belief that they had the right to do so."

Many illustrative instances of the application of the doctrine of equitable estoppel are found in the decisions in this State. Among these are cases of part performance of oral agreements for the purchase or partition of lands, where improvements have been made on the property in reliance upon the oral agreement. *Massey v. McIlwain,* 2 Hill Eq.

421, 426; *Goodhue v. Barnwell,* Rice, Eq., 198, 237; *Smith v. Smith,* 1 Rich. Eq., 130; *Mims v. Chandler,* 21 S. C., 480, 492; *Kennemore v. Kennemore,* 26 S. C., 251; 1 S. E., 881 (oral partition between brothers). *Martin v. Patterson,* 27 S. C., 621; 2 S. E., 859. *Watts v. Witt,* 39 S. C., 356, 367; 17 S. E.; 822. *Suber v. Richards,* 61 S. C., 393, 402; 39 S. E., 540. *Peay v. Seigler,* 48 S. C., 496; 512; 26 S. E., 885; 59 Am. St. Rep., 731. *Alexander v. McDaniel,* 56 S. C., 252; 34 S. E., 405. *Pennington v. Pennington,* 89 S. C., 277; 71 S. E., 825. Also cases of oral agreements to make provision by will, when services have been rendered or other acts done pursuant to and in reliance upon such oral agreement. *Gary v. James,* 4 Desaus., 185; *McKeegan v. O'Neill,* 22 S. C., 454; *Fogle v. St. Michael Church,* 48 S. C., 86; 26 S. E., 99. *Bruce v. Moon,* 57 S. C., 60; 35 S. E., 415. *Turnipseed v. Sirrine,* 57 S. C., 559; 35 S. E., 757; 76 Am. St. Rep., 580. *Stuckey v. Truett,* 124 S. C., 112; 117 S. E., 192. Also cases of parol gifts of real estate, where the donee had entered into possession of the premises under the gift and had done acts in pursuance thereof which had substantially changed the former position of the parties. *Hart v. Hart,* 3 Desaus., 592; *Hunter v. Mills,* 29 S. C., 72; 6 S. E., 907.

4. It is stated, however, that it must appear, as an essential element of proof of part performance, that the acts relied upon to show part performance "were done in pursuance of the contract, and for the purpose of carrying it into execution, and with the consent or knowledge of the other party." *Riggles v. Erney,* 154 U. S., 244, 254; 14 S. Ct., 1083, 1086; 38 L. Ed., 976, 980. As to the consent and knowledge of the appellant in the present case, the Circuit Judge has expressed his opinion of the testimony, that a perusal of the evidence shows satisfactory proof of the family arrangement in which the appellant joined. Certainly the appellant must have known of his mother's payment of the debts of the estate and of the valu-

able improvements that she made on the property. Even if there had been no benefit accruing, or expected to accrue, to him as a result of the family arrangement to let his mother continue in possession of the property, yet the agreement should be sustained.

Other Courts of recognized authority and the highest standing are in accord with ours in giving application to the principles of equitable estoppel in the protection of rights based on parol gifts.

Thus, in *Freeman v. Freeman,* 43 N. Y., 34; 3 Am. Rep., 657, in holding that a parol promise to give land, followed by acceptance of the possession and erection of improvements, stands in equity on an equal footing with a parol promise to sell where possession is surrendered and the purchaser performs on his part, the Court said:

"Anything that may be detrimental to the promisee or beneficial to the promisor in legal estimation will constitute a good consideration for a promise. Expenditures made upon permanent improvements upon land with the knowledge of the owner, induced by his promise, made to the party making the expenditure, to give the land to such party, constitute in equity a consideration for the promise."

In the same opinion the Court also pointed out that the real ground for enforcing such a gift is to prevent a fraud being practiced upon the donee by his having been induced to expend his money on improvements upon the creation or condition of the gift.

A similar application of the equitable conception of estoppel in upholding parol gifts appears in *Neale v. Neale,* 9 Wall., 1, 12; 19 L. Ed., 590, 592, a case in which the Court, while holding "the case as stated is made out with reasonable certainty, which is all that it required," had, nevertheless, said of the evidence:

"It is in many respects conflicting and contradictory, and it is to be regretted that the contest over this property, like

all contests between near relations, has elements of bitterness in it."

The principles of estoppel applicable in the case are stated in the opinion as follows:

"The Statute of Frauds requires a contract concerning real estate to be in writing, but Courts of Equity   *   *   * have stepped in and relaxed the rigidity of this rule, and hold that a part performance removes the bar of the statute, on the ground that it is a fraud for the vendor to insist on the absence of a written instrument, when he had permitted the contract to be partly executed. And equity protects a parol gift of land, equally with a parol agreement to sell it, if accompanied by possession, and the donee, induced by the promise to give it, has made valuable improvements on the property. And this is particularly true, where the donor stipulates that the expenditure shall be made, and by doing this makes it the consideration or condition of the gift."

5. As to whether the acts shown to have been done by the respondent were in pursuance of the family arrangement, this may well be answered in the words used in *Neale v. Neale, supra:* "On no other theory of this case are the undisputed facts reconcilable with the conduct of the parties." The widow of Hugh Smith, with her children, would have been entitled, in the absence of a family settlement affecting their inheritance, to continue in the possession of the estate property as tenants in common until partition of the premises. Do her acts show any assertion of dominion over the land other than as a tenant in common with her children? The appellant has answered the question against his own contention when he says in his argument: "The testimony is that since the remarriage of Mrs. Williams in 1905, none of the children have been allowed to live with her on the place, except Newton Smith, who is living now on the 52-acre tract." Was the family arrangement that the widow of Hugh Smith should pay the debts of the estate and retain full possession and enjoyment carried into effect

by part performance? The statement just quoted gives the answer that she has had the full possession and enjoyment of the property for some 16 or 17 years before the commencement of the action, exercising the right as she pleased to exclude her children from the property. As to performance of the agreement on her part, her statement is undenied that none of the children except Newton helped her to pay the debts.

Another factor that enters into the proof of acts done pursuant to and in reliance upon the contract is the nature and extent of the improvements she placed on the premises. *McMillan v. McMillan,* 77 S. C., 511, 515; 58 S. E., 431. The house was remodeled in 1909; other improvements were made about the same time; and altogether improvements to the value of about $4,000.00 were placed on the property. In this situation the statement, quoted with approval by this Court in the comparatively recent case of *Martin v. La Boon,* 116 S. C., 97, 106; 107 S. E., 320, 323, becomes clearly applicable:

"Although continued possession, because of the fact that it may be referable to the antecedent right and not necessary to the new right or estate created by the contract, is insufficient to prevent the operation of the statute, yet the contrary is the case when accompanied by some further acts, such as payment of the purchase price or making substantial and valuable improvements which characterize the continued possession and make it referable to the new relation created by the contract."

6. There remains for consideration the contention that no legal agreement could have been made just after Hugh Smith's death, because of the minority of three of the children. If the sole reliance of the respondent were placed upon the agreement entered into at the family conference, then there is no doubt that the agreement, whether parol or written, might have been repudiated by all or any of the minors upon coming of age. But in

an agreement of this character, infancy makes it voidable, not void. If disaffirmance is intended, then the act of disaffirmance must be made within a reasonable time after the disability of infancy ceases. *Ihley v. Padgett*, 27 S. C., 300, 304; 3 S. E., 468. Assent to be bound by the agreement, signified either by express recognition or acts implying recognition after the minor comes of age, precludes the later attempt at disaffirmance.

This has been the rule uniformly followed since the early days of this Court when it was said by Mr. Justice Johnson:

"The result of my own reflections after a good deal of labor bestowed on the subject, is that * * * those [contracts] based upon a moral, legal, and valuable consideration bind adults. The policy of the law permits an infant to avoid them, but if after arriving at full age he thinks proper to affirm them he ought to be bound. * * * A very slight circumstance demonstrating his assent, will bind him; or any act by which his assent is manifested. * * * In short any word or action, from which assent to the contract may fairly be deduced, will be regarded as a confirmation." *Cheshire v. Barrett*, 4 McCord, 241, 244 (17 Am. Dec., 735).

One of the circumstances regarded as manifesting confirmation is "acquiescence, from which assent may be fairly inferred." *Norris v. Vance*, 3 Rich., 164. Or, as was declared by Chancellor Dargan in another early case: "An unreasonable delay after the removal of the disability amounts to acquiescence, and acquiescence is affirmation." *Bossard v. White*, 9 Rich. Eq., 483, 499. The application of these principles is given still more definite point in relation to the rights involved in the present case by the statement quoted and adopted in the decision of *Scott v. Scott*, 29 S. C., 414; 7 S. E., 811, as follows:

"If an infant continues, after arriving at full age, to occupy a position, which is only explicable upon the supposi-

tion that he intended to stand by a contract executed during minority, such contract will be deemed to be ratified."

The plaintiff was 35 years old when he commenced this action. Fourteen years after he was of full age, he stood silently by, knowing throughout this entire period that his mother's every act in relation to the estate property breathed her reliance upon her right to continue undisturbed in her possession of the place. Not only were extensive improvements made, but in 1909, a year or more after appellant, the youngest child, had reached the age of maturity and legal responsibility, his mother, the respondent, gave a mortgage for nearly $800.00 on her individual interest in the 72-acre place, in aid of administration to take care of debts of the estate. Entirely aside from any consideration of the testimony bringing home to him notice of the family arrangement, would it have been possible for appellant during this 14-year period of mature years to have continued without knowledge of his mother's claim that she was entitled to the use of the property during her lifetime? It seems inconceivable that this could have been the case. In the meantime the situation of all parties, particularly that of the respondent, has been greatly changed by acts done in obvious reliance on the family arrangement. A restoration of former conditions is impossible.

To permit either the Statute of Frauds or the disability of infancy to be set up by the appellant at this late date would be unconscionable, and would assist him in perpetrating a virtual fraud against his mother by putting her out of the home that her own hard work had made valuable, and by leaving her in her old age to the chance of an accounting for reimbursement of her outlays. *Kinard v. Proctor,* 68 S. C., 279; 47 S. E., 390. *Townsend v. Vanderwerker,* 160 U. S., 171; 16 S. Ct., 258; 40 L. Ed., 383, 387. In stating this conclusion, we again quote from *Pomeroy,* § 816:

"Acquiescence is an important factor in determining equitable rights and remedies, in obedience to the maxims,

'He who seeks equity must do equity'; and 'He who comes into equity must come with clean hands.' Even when it does not work a true estoppel upon rights of property or of contract, it may operate in analogy to estoppel—may produce a *quasi* estoppel—upon the rights of remedy."

7. The appellant also seeks refuge behind the infancy of his deceased sister, Pearle Wood, coupling her disability of infancy with that of her children, Annie Wood Lawton and Clyde Wood, which existed at the time this action was brought. As to the rights that Pearle Wood may have had at her death, Judge Bonham has stated in his decree: "She attained her majority before her death and never repudiated the arrangement." Any sufficient recognition of the agreement by her after she attained majority would have been equally binding on her children. That there was such recognition is not questioned by her children in this appeal. Annie Wood Lawton has come of age since the action commenced and has filed an answer in express confirmation of the agreement. Clyde Wood appears as a respondent in this appeal. The appellant is not authorized to speak for either of them. For his own gain he puts into their mouths the claim that they do not make for themselves. But there is a further conclusive answer to appellant's contentions. The right of relying on the disability of their mother's infancy existed solely in favor of the children of Pearle Wood. It cannot furnish saving grace to relieve the appellant, J. B. Smith, or his sister and coappellant, Mamie Haddon, from the effect of their assent to the family arrangement, or from the estoppel of conduct that is furnished by their own acts.

The judgment of the Circuit Court dismissing the complaint is affirmed.

MR. CHIEF JUSTICE WATTS and MESSRS. JUSTICES COTHRAN, STABLER, and CARTER concur.

MR. JUSTICE BLEASE did not participate.